965 A.2d 900

**Dion G. TUCKER**

v.

**STATE of Maryland.**

**No. 35 Sept.Term, 2008.**

Court of Appeals of Maryland.

Feb. 20, 2009.

Ryan Corle, Assigned Public Defender (Jason L. Lichtman, Assigned Public Defender of Howrey, LLP, Washington, DC), on brief, for Petitioner.

Sarah Page Pritzlaff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BATTAGLIA, Judge.

Petitioner, Dion G. Tucker, invites us to explore the application of our decision in *Smith v. State*, 388 Md. 468, 880 A.2d 288 (2005), to a sentence included in a cross-racial identification jury instruction. In doing so, we do not address whether such an instruction was appropriate in the case at bar, but whether, once given, the instruction was a correct statement of the law. We granted certiorari, *Tucker v. State*, 405 Md. 290, 950 A.2d 828 (2008), with respect to the following question:

> Did the trial court err in granting the State's jury instruction regarding cross-racial identification over Mr. Tucker's objection, when the State's instruction misquoted applicable law and directed the jurors to believe that cross-racial identification was not a factor in eyewitness testimony?

We shall hold that the trial judge erred because the instruction, as formulated, was not a correct statement of the law.

## I.  Introduction

### A.  Facts

The State's evidence tended to show the following facts:

On the morning of September 30, 2005, Hilary Auth was in her bathroom when she heard a loud banging noise. She peered out the window, and saw a man in a hooded, "light blue sweatshirt, blue/gray sweatshirt ... [with] a design on it," dark jeans and heavy boots, attempting to break into her home; she identified the man as black when he looked up for a brief second and she saw part of his eye and face. After attempting to call 911 but getting no dial tone, Auth concealed herself in her bedroom, and peeking through the bedroom door, noticed a different African–American man in a red-hooded sweatshirt, heavy boots, and jeans, with slightly less than shoulder-length braided hair, of slight build, relatively thin and without "broad shoulder[s]," coming up the stairs.

Auth then moved from her bedroom to her livingroom, and once there, called 911 from a cordless phone. While waiting

for the 911 operator, Auth looked from the livingroom to the top of the stairs and saw the red-hooded individual looking back at her, as well as the same blue/gray-hooded individual that she had seen from her bathroom window, standing behind. Auth stated that the red-hooded individual declared "I'm out," had a dispute with the blue/gray-hooded burglar, and ran out the front door. Auth gave no facial description of the blue/gray-hooded burglar; although she later identified the burglar as Tucker.

Police officers arrived soon thereafter and found neither burglar in the house. Auth met with Detective Tracy Williams, provided a description of the burglars, and reported that her cell phone, keys and purse had been stolen, as well as credit cards, including a Target Visa card, which was immediately cancelled. Detective Williams had an opportunity to speak with a credit card representative from Target stores, who told him that Auth's card had been used less than an hour after the burglary at a Target in Bowie, Maryland, and that the card was used again at a Target in Forestville, Maryland; both attempts to use the card were fruitless.

Detective Williams obtained a videotape of the Bowie Target and a description from a Target loss prevention officer of a 2005 Chevrolet Impala. On the videotape, a man and three women were shown shopping and then attempting to buy electronics, using the Target Visa. The man specifically was shown pushing a shopping cart, choosing items to purchase, and proceeding to checkout with the three women who accompanied him, one of whom later turned out to be Jasmine Joyner, who actually had the card in her hand. After the card was denied because Joyner's identification did not match the name on the Target card, the four left in the 2005 Chevrolet Impala.

On October 4, four days after the burglary, Auth viewed the Target videotape and almost immediately identified two of the individuals in the Target stores as those that she had seen in her home. Ten days later, Detective Williams submitted the

two pictures identified by Auth to a local newspaper, in an attempt to solicit pertinent information.

Within five days of the bulletin, on October 19, Tucker reported to the Anne Arundel County Police Department that his 2005 Chevrolet Impala had been stolen sometime between October 14 and October 19. Shortly thereafter, Detective Williams discovered Tucker's stolen auto report, which precipitated his securing a picture of Tucker, who the Detective then identified as the man on the Target videotape. Investigating further, Detective Williams spoke to Investigator William Kissler, who informed him that a car resembling the Chevrolet Impala had been found, but that because it had been completely burned, it was not possible to identify the car or its owner.

Detective Williams brought Tucker in for questioning on October 27, and after having been advised of his *Miranda* rights, Tucker spoke to police. He was shown four still photos taken from the Target videotape and was able to identify the three women, as Cheryl, Monique and Jasmine, but declared that the man in the fourth photo was his "twin brother, Mongo." After being shown a picture of his older brother Mongo, Tucker admitted it was he in the picture. Tucker further asserted that Jasmine, Monique and Cheryl had come to his home during the morning of September 30, sometime after 10:30 a.m., and asked him to drive them to Target in his Chevrolet Impala. Tucker stated that he initially had believed that they were just going shopping, until Joyner was denied the use of the Target card because her identification did not match the name on the card. Tucker also admitted that the group attempted to make other electronics purchases at the Forestville Target, but again, the card proffered by Joyner was denied; although at a 7–Eleven store, they successfully used the card to purchase gas.

In a signed statement, Tucker denied being involved in the burglary and declared that Jasmine, a black female about 21 years old with shoulder length braided hair, was involved in a burglary before she came to his house with Cheryl that

morning. When asked whether Jasmine had had any cuts on her hand that day, Tucker remembered that she had put a bandage on a cut on one of her fingers and that it had continued to bleed. Taylor also, when responding to a question about who had stolen his car, opined, "I think it was Jasmine. My mother told me that there was an article in the Capitol Newspaper that showed my picture and hers. The article was accusing us of committing the burglary. I called Jasmine and told her about it. I think she stole my car and set it on fire to destroy any evidence. I don't have any proof, but I think Jasmine thought that she was seen in my car leaving Target that day."

Tucker was arrested and charged with first, third and fourth degree burglary, theft, and stealing another's credit card; although he subsequently was indicted only for first degree burglary,[1] breaking and entering Auth's home, and for theft over $500,[2] more specifically, of a diamond band, a

---

1. Section 6–202 of the Criminal Law Article, Maryland Code (2002, 2005 Repl.Vol.) stated:
   (a) *Prohibited.*—A person may not break and enter the dwelling of another with the intent to commit theft or a crime of violence.
   (a) *Penalty.*—A person who violates this section is guilty of the felony of burglary in the first degree and on conviction is subject to imprisonment not exceeding 20 years.

2. Section 7–104 of the Criminal Law Article, Maryland Code (2002, 2005 Repl.Vol.), stated, in pertinent part:
   (a) *Unauthorized control over property.*—A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person:
   (1) intends to deprive the owner of the property;
   (2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or
   (1) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.
   * * *
   (g) *Penalty.*—(1) A person convicted of theft of property or services with a value of $500 or more is guilty of a felony and:
   (i) is subject to imprisonment not exceeding 15 years or a fine not exceeding $25,000 or both; and
   (ii) shall restore the property taken to the owner or pay the owner the value of the property or services.

camera, a nominal amount of currency, car keys and other personal property of the Auth's. At trial, Auth's eyewitness identification of Tucker was an important piece of evidence; she testified that she was "a hundred percent certain" that Tucker was the burglar in the blue/gray-hooded sweatshirt outside, and then, inside her home, as well as the man on the Target videotape.

On cross-examination, Tucker questioned Auth about inconsistences in her testimony from earlier statements, including the hue of the sweatshirt and whether she had told Detective Williams earlier that she was unable to make a positive identification because the suspect had had his hood up the entire time; Auth responded that she had no recollection of that statement. Tucker ended his cross-examination by questioning Auth's confidence in her ability to identify members of another race, and specifically, how many African–Americans lived in her neighborhood.[3]

---

(2) Except as provided in paragraphs (3) and (4) of this subsection, a person convicted of theft of property or services with a value of less than $500, is guilty of a misdemeanor and:

(i) is subject to imprisonment not exceeding 18 months or a fine not exceeding $500 or both; and

(ii) shall restore the property taken to the owner or pay the owner the value of the property or services.

This Section was subsequently amended without significant change by Chapter 25 of the Maryland Acts of 2005, and Chapters 36, 393 and 394 of the Maryland Acts of 2008.

**3.** Tucker questioned Auth about the racial makeup of her neighborhood accordingly:

[DEFENSE COUNSEL]: The racial makeup of the community in which you live, would you indicate that the community in which you live is not primarily African American?

[AUTH] No I would not say that at al[l].

\* \* \*

[DEFENSE COUNSEL]: Okay? And could you give us a percentage that you believe to be African American that is in that community?

\* \* \*

[AUTH]: I live in a rural area, so I would say the neighbor to my immediate right, facing my home, is a Caucasian gentleman. The next five homes down are African American families. The gentleman—I live on a corner—the gentleman across the street is Caucasian, and he built his home about a year and a half ago; he is new to

Stipulations were entered into evidence reflecting that forensic experts had excluded Tucker, both as the source of the fingerprints and as the source of blood DNA found inside and outside the Auth's home, and Detective Williams testified, in addition to the information regarding his investigation and Tucker's statement, that Auth almost immediately had recognized Tucker and Joyner as the burglars when she witnessed the Target videotape.

On cross-examination of Detective Williams, inconsistences from Auth's testimony to her prior handwritten statement and Detective Williams police report were explored, such as lack of identification of any sweatshirt insignia in the two contemporaneous statements and a failure to provide any facial description. Tucker also attempted to impeach Auth's testimony that she was "a hundred percent certain" that Tucker was the burglar, by having Detective Williams read page 5 of his police report, where he had written:

Mrs. Auth stated that the male wearing the gray hooded sweatshirt appeared to be the other suspect that she first [had] seen trying to break into her basement door. Mrs Auth stated that because the suspect had his hood up the entire time during the incident, she could not make a positive identification of him.

At the end of evidence, Tucker elected not to testify, so the judge entertained discussion about jury instructions, and in particular, arguments regarding a cross-racial identification instruction. Tucker proffered that because a cross-racial identification was central to the state's case, a cross-racial identification instruction, using the following language from *United States v. Telfaire*, 469 F.2d 552, 561 (D.C.Cir.1972) (Bazelon, C.J., concurring), was appropriate:

In this case the identifying witness is of a different race than the defendant. In the experience of many it is more difficult to identify members of a different race than mem-

the area. And the next, I would say, five homes from across the street down are African American families.

bers of one's own. If this is also your own experience, you may consider it in evaluating the witness's testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of the defendant's race that he would not have greater difficulty in making a reliable identification.

The State countered that cross-racial identification was not appropriately raised, so a cross-racial instruction should not be given. The trial judge determined that the issue presented a "close call," but explained that he wanted to give the instruction, based upon the discussion presented in *Janey v. State*, 166 Md.App. 645, 665–66, 891 A.2d 355, 367 (2006), *cert. denied*, 392 Md. 725, 898 A.2d 1005 (2006), in which the Court of Special Appeals had opined:

Conversely, the mere fact that a witness denies any difficulty in making cross-racial identifications should not deter the trial judge from considering giving such an instruction, particularly if, in the language of the [*State v.*] *Cromedy*[, 158 N.J. 112, 727 A.2d 457 (1999)] court, "identification is a critical issue in the case, and [the] eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability." 727 A.2d at 467. Even in the face of a witness's strenuous denial of personal difficulty in making cross-racial identifications, because the studies cited by the Court of Appeals in *Smith and Mack*, 388 Md. at 478–86, 880 A.2d 288, indicate that there is a "strong consensus among researchers . . . that some witnesses are more likely to misidentify members of other races than their own," *id.* at 482, 880 A.2d 288, the trial judge must, upon request, consider whether an instruction is appropriate in the case.

Accordingly, our holding in this case—that the trial judge did not abuse his discretion in refusing to give the requested instruction on cross-racial identification—should not be interpreted as holding that it is never appropriate to give such an instruction. Nor should the fact that no instruction on

cross-racial identification appears yet in the Maryland Criminal Pattern Jury Instructions serve as the basis for an arbitrary refusal to consider granting such an instruction.

The State asked the judge to add one sentence to the instruction, allegedly "pulled straight from the *Smith* and *Mack* case, at page 484, 880 A.2d 288," a case preceding *Janey,* in which cross-racial identification was in issue. The entire sentence referenced actually read:

> Proponents of the studies argue that there is "no particular reason to think that the other-race effect ... does not apply [to] eyewitnesses in actual criminal cases," whereas others contend that studies on cross-racial identification "bear little resemblance to real-life crimes."

*Smith,* 388 Md. at 484, 880 A.2d at 297 (citations omitted) (alterations in original). The State's requested sentence, nevertheless, postulated:

> There is no particular reason to think that cross-racial identification applies to eyewitnesses in actual criminal cases.

The trial judge included the State's sentence, and the entire cross-racial instruction, as it was given to the jury, stated:

> In this case the identifying witness is of a different race than the Defendant. In the experience of many, it is more difficult to identify members of a different race than members of their own race. If this is also your experience, you may consider that fact in evaluating the witness's testimony. You must also consider whether there are other factors present in the case which overcome any such difficulty in identification. For example, you may conclude that the witness had sufficient contacts with members of Defendant's race that he would not have any greater difficulty in making a reliable identification.
>
> There is no particular reason to think that cross-racial identification applies to eyewitnesses in actual criminal cases.

Tucker was convicted of both first degree burglary and theft over 500 dollars. The theft count was merged with the

burglary count for sentencing, and Tucker received 15 years, all but 10 years suspended. A three-judge panel of the circuit court upheld the sentence, and Tucker noted an appeal to the Court of Special Appeals.

In the Court of Special Appeals, Tucker argued that the trial judge erred by giving the specific instruction on cross-racial identification, by admitting eyewitness identification evidence obtained by impermissibly suggestive means, by admitting evidence regarding Tucker's car, by denying his motion for a mistrial, and also by determining that the evidence was sufficient to sustain the conviction, in addition to plain error arising from the State's closing argument. The Court of Special Appeals, in an unreported opinion, affirmed the conviction, specifically holding that the cross-racial instruction did not misstate applicable Maryland law, because the sentence "remain[ed] true to the *Smith* Court's conclusions regarding the ultimate efficacy of cross-racial identification." Tucker petitioned for certiorari, asking us to address the formulation of the jury instruction.

## II. Discussion

### A. Jury Instruction

The sole issue that is presented in this case is whether the instruction, as given, was a correct statement of law, although the parties at various junctures have suggested that the whole issue of cross-racial identification, including whether the facts of the trial generated the need for a cross-racial identification jury instruction, is before us. We only address whether the jury instruction was a correct statement of the law; Tucker asserts that it was not, while the State asserts that it was.

Jury instructions are governed by Maryland Rule 4–325, which states:

(a) **When Given.** The court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supplement them at a later time when

appropriate. In its discretion the court may also give opening and interim instructions.

**(b) Written Requests.** The parties may file written requests for instructions at or before the close of the evidence and shall do so at any time fixed by the court.

**(c) How Given.** The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

**(d) Reference to Evidence.** In instructing the jury, the court may refer to or summarize the evidence in order to present clearly the issues to be decided. In that event, the court shall instruct the jury that it is the sole judge of the facts, the weight of the evidence, and the credibility of the witnesses.

**(e) Objection.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

**(f) Argument.** Nothing in this Rule precludes any party from arguing that the law applicable to the case is different from the law described in the instructions of the court stated not to be binding.

We have interpreted Rule 4–325(c) as requiring the trial court to give a requested instruction when: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered

elsewhere in the jury instruction actually given. *Dickey v. State*, 404 Md. 187, 197–98, 946 A.2d 444, 450 (2008); *Thompson v. State*, 393 Md. 291, 302–03, 901 A.2d 208, 214 (2006); *Patterson v. State*, 356 Md. 677, 683–84, 741 A.2d 1119, 1122 (1999).

Here, we are called upon specifically to address one phrase of an instruction, that being, "There is no particular reason to think that cross-racial identification applies to eyewitnesses in actual criminal cases," alleged by the State to be a correct statement of the law based upon our opinion in *Smith*, 388 Md. at 484, 880 A.2d at 297. In *Smith*, we were called upon to address whether the trial judge erred in preventing Smith from making closing remarks in a case in which he and Mack, both African–Americans, were being tried for armed robbery and assault of a white victim.[4] After reviewing commentaries, cases from other jurisdictions, and this State's history of permitting defendants to " 'discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence,' " *id.* at 488, 880 A.2d at 299, quoting *Henry v. State*, 324 Md. 204, 230, 596 A.2d 1024, 1037 (1991), we determined that the trial judge erred when she prevented defense counsel from arguing the implications of cross-racial identification, where the victim had testified that she had a heightened ability to identify faces:[5]

> Defense counsel clearly was entitled to challenge [the victim's] "educated" identification of the defendants by arguing

---

**4.** Smith and Mack also were charged with handgun violations.

**5.** In addition to testifying that she was "extremely good with faces," the victim stated:

> Well, I am a teacher and I watch lay mannerisms. I've been studying art and painting people since I was a little girl. I'm obsessed with people's postures and the way you'[re] looking [at] them and seeing what's going on.
>
> * * *
>
> And so, I think [of] myself [as] very, very good with people. [I] study faces and I have, I look for features on people that make them more distinct, Adams apple—

*Smith v. State*, 388 Md. 468, 475, 880 A.2d 288, 292 (2005) (alterations in original).

to the jury that her identification should not be accorded the weight that she credited to her own ability to identify them. At this juncture the extent to which own-race bias affects eyewitness identification is unclear based on the available studies addressing this issue, so that we cannot state with certainty that difficulty in cross-racial identification is an established matter of common knowledge. Here, however, the victim's identification of the defendants was anchored in her enhanced ability to identify faces. Under these circumstances, defense counsel should have been allowed to argue the difficulties of cross-racial identification in closing argument.

Therefore, we conclude that the trial court erred in refusing to allow defense counsel to comment on cross-racial identification in closing argument.

*Id.* at 488–89, 880 A.2d at 300.

In *Smith*, when explaining the "cross-race effect," we had occasion to discuss the dichotomy between laboratory or field studies and "real-world" situations, recognizing that:

Another point of contention among researchers and scholars regarding the legitimacy of the cross-race effect is whether the results of both the laboratory and field studies are applicable to "real-world" situations where a victim or witness confronts an assailant and then later must attempt to identify that person. *See* Gary L. Wells & Elizabeth A. Olson, *The Other–Race Effect in Eyewitness Identification: What Do We Do About It?*, 7 Psychol. Pub. Pol'y & LawW 230, 230 (2001). *Proponents of the studies argue that there is "no particular reason to think that the other-race effect . . . does not apply [to] eyewitnesses in actual criminal cases," id., whereas others contend that studies on cross-racial identification "bear little resemblance to real-life crimes."* Bartolomey, Cross–Racial Identification Testimony and What Not To Do About It, 7 Psychol. Pub. Pol'y & Law 247, 249 (2001).

*Id.* at 484, 880 A.2d at 296–97 (underlining and italics added). It is the last sentence—suggesting that there are two sides to

the issue of cross-race effect when real crimes, as opposed to laboratory situations, are involved—with which we are concerned. When the State offered the sentence, "There is no particular reason to think that cross-racial identification applies to eyewitnesses in actual criminal cases," it was only providing one part, one hypothesis, from the dichotomy of theories that were explained. In so doing, the State mischaracterized what we were suggesting in Smith—that there were commentators who both supported and denied the real-life effect of cross-racial identification—by offering only that portion of the sentence that referred to commentators who denied the cross-race effect in real life situations. The proffer was an inaccurate statement of the law, and, as a result, we hold that it was error for the trial judge to have given the instruction requested by the State.

## B. Harmless Error

■ We now turn to whether the trial judge's error was harmless.[6] We recently addressed the application of the harmless error rule in *Bellamy v. State*, 403 Md. 308, 332–33, 941 A.2d 1107, 1121 (2008) (internal citations omitted), when Judge Glenn T. Harrell, writing for the Court, noted:

> In *Dorsey v. State*[, 276 Md. 638, 350 A.2d 665 (1976)] . . . we adopted the test for harmless error announced by the Supreme Court in *Chapman v. State* [of Cal., 386 U.S. 18, 87

---

6. It is interesting to note that recently the Supreme Court in *Hedgpeth v. Pulido*, 555 U.S. ——, 129 S.Ct. 530, 172 L.Ed.2d 388, (2008), was asked to determine whether it was structural error (and thus not subject to harmless error analysis), when a jury convicted a defendant by general verdict, but one of the alternative theories of guilt was an invalid one. The United States Court of Appeals for the Ninth Circuit had held that the invalid instruction was structural error and not subject to harmless error review. *Pulido v. Chrones*, 487 F.3d 669, 676 (9th Cir.2007). The Supreme Court reversed, holding that the instructional error was not "structural," and was subject to the "substantial and injurious effect" standard of *Becht v. United States*, 403 F.3d 541, 548–49 (8th Cir.2005), cert. denied, 546 U.S. 1177, 126 S.Ct. 1346, 164 L.Ed.2d 59 (2006). *Hedgpeth*, 555 U.S. at ——, 129 S.Ct. at 532–32, 172 L.Ed.2d at 392.

S.Ct. 824, 17 L.Ed.2d 705 (1967)].... As adopted in *Dorsey*, the harmless error rule is:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict.

In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine." " 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt.' " " 'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' " The "harmless error rule ... has been and should be carefully circumscribed." Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal.

(Citations omitted). Based upon the *Dorsey* standard, we cannot say that the error regarding the cross-racial identification instruction was harmless beyond a reasonable doubt, because the eyewitness identification by Auth was so central to the conviction and because all other evidence was concededly corroborative of her testimony—testimony now tainted by the discounting of any potentially adverse effect of cross-racial bias in the erroneous instruction.

■ Although we certainly are aware that the exclusive possession of recently stolen goods permits the drawing of an inference of fact strong enough to sustain a conviction that the possessor was the thief, or in the present case, the burglar, we also suggest that the inference can be negated by a satisfactory explanation. *Brewer v. Mele,* 267 Md. 437, 449, 298 A.2d 156, 164 (1972) ("We have long and consistently held that exclusive possession of recently stolen goods, absent a satisfactory explanation, permits the drawing of an inference of fact strong enough to sustain a conviction...."). In the present case, it may be significant that Joyner, not Tucker, physically possessed the Target credit card and that Tucker suggested in statements given to Detective Williams, and introduced into evidence, that he was a witless participant in the attempted purchase of goods. Whatever occurs during the retrial of this case, nevertheless, we are not persuaded beyond a reasonable doubt that the trial judge's error in formulating the instruction was harmless.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF CONVICTION AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY ANNE ARUNDEL COUNTY.**

HARRELL, J., dissents and files opinion in which MURPHY and ADKINS, JJ., join in part.

MURPHY, J., files a dissenting opinion.

Dissenting Opinion by HARRELL, Judge, which MURPHY and ADKINS, JJ., join in part.

I write separately for two reasons. First, to appeal to parties (but primarily the State, I imagine, in most instances) in future criminal trials, where either expert testimony is proffered or a jury instruction is sought on the subject of

cross-racial identification difficulties, to seek a *Frye*[1]–*Reed*[2] or in limine hearing (and the judges in those cases to make a determination based on that hearing) regarding the validity and reliance *vel non* of the scientific underpinning of that subject. Second, in the present case, I would affirm the convictions rendered by the jury in the Circuit Court for Anne Arundel County, based on application of harmless error analysis.

## I.

There appear to be three reported Maryland opinions in which a flagship issue was the propriety of jury instructions or closing argument involving reputed cross-racial eyewitness identification difficulties—the present case, *Smith v. State*, 388 Md. 468, 880 A.2d 288 (2005), and *Janey v. State*, 166 Md.App. 645, 891 A.2d 355 (2006), *cert. denied*, 392 Md. 725, 898 A.2d 1005 (Table) (2006). In none of these cases was a motion *in limine* filed or made, or a demand lodged seeking a *Frye–Reed* hearing, regarding the scientific basis of the theory of cross-racial identification difficulties. Likewise, no judge in any of those cases, on his or her initiative, elected to hold such a hearing. Thus, it has gone largely unexamined and unresolved in Maryland whether the underlying social science, adequate to the purposes of a court of law, (that is, whether the theories and methodologies are generally accepted in the relevant scientific community—*see Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 332–33, 923 A.2d 939, 949–50 (2007)), supports a relevant instruction or the propriety of such an argument. It is crystal clear that the reputed bases for such an argument or requested instruction is grounded on as yet untested (in Maryland courts) scientific research and conclusions. *See Smith*, 388 Md. at 478–85, 880 A.2d at 294–98.[3]

---

1. *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

2. *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978).

3. The majority opinion in *Smith* conceded that, at least in 2005, "[a]t this juncture the extent to which own-race bias affects eyewitness

Because of the procedural posture in which *Smith, Janey,* and the present case reached our appellate courts (due to the absence of a *Frye–Reed* or in limine hearing to evaluate the science), conclusive resolution of the validity and reliability of the underlying science has been shielded from necessary judicial scrutiny.[4] Let us consider the threshold question before proceeding to the consequences, as have been the cases so far. I urge someone to move, in the appropriate circumstances, for a *Frye–Reed* or in limine hearing and for a trial judge to consider and rule on the scientific validity and reliability of the underlying science. If the science withstands *Frye–Reed* or in limine scrutiny (in the latter case, applying *Frye–Reed* principles), a pattern instruction could be devised and included in the standing litany so as to avoid future cases of the kind represented here.

## II.

Whether the instruction sought by Tucker in the present case was generated by the evidence is, for me, problematic. I suppose, for present purposes, that we must assume that it was apparent to the jury, the trial judge, and the parties that Tucker is African–American and Ms. Auth, the victim, is Caucasian–American (whatever the bundle of observable physical attributes those classifications portend). The only record evidence bearing on Ms. Auth's ability to identify and distinguish between African–Americans (or any other race of persons) came from a hugely unsuccessful fishing expedition by defense counsel during cross-examination of Ms. Auth when

---

identification is unclear based on the available studies addressing this issue, so that we cannot state with certainty that difficulty in cross-racial identification is an established matter of common knowledge." 388 Md. at 488, 880 A.2d at 300.

4. Beyond the nuances of what is "race" and which "race" any individual fairly may be deemed a member of for purposes of own-race bias regarding identification of persons of other "races," there decidedly appears to be no scientific consensus which direction the asserted difficulties run where persons of apparent Asian and Hispanic ancestry are implicated. *Smith,* 388 Md. at 481–82 nn. 7–8, 880 A.2d at 296 nn. 7–8.

he tried to establish that she possessed limited substantive exposure to African–Americans in the rural community where she resided at the time of the crime. The defense's efforts yielded testimony that, to the contrary of what apparently he hoped to establish, Ms. Auth lived on a street where 10 of the 13 homes were occupied by African–American families. Thus, essentially, the sole evidentiary predicate "generating" the instruction sought here was that the victim and the defendant presumably had different skin colors. If that is all that it takes to generate an evidentiary basis for the giving of a cross-racial identification jury instruction, much of the mischief I foresaw in my dissent in *Smith,* 388 Md. at 489–500, 880 A.2d at 300–06, will more likely come to pass.[5] I hope that will not be the case. I believe, on this record, Tucker received more than he was entitled to receive in giving any instruction regarding cross-racial identification difficulties, even with the sentence added by the judge at the behest of the prosecutor.

Assuming, however, that Tucker was entitled by the evidence to a cross-racial identification difficulty instruction, that the instruction he sought was an accurate statement of the law (itself a big "if"), and that it was error to engraft onto his proposed instruction what the State asked for, I nonetheless conclude, on this record, such error was harmless beyond a reasonable doubt.

Whatever the nature of the difficulties of a cross-racial identification, that was not central to Tucker's trial. The actual eyewitness identification difficulties here were attributed to the acute angles and time available for Ms. Auth's observations of him while he was breaking into and moving

---

5. *Compare Smith,* 388 Md. at 488, 880 A.2d at 300 (apparent Caucasian–American eyewitness/victim bolstered her identification of apparent African–American defendant by alluding to her special training and faculties for recognizing people), *with Janey,* 166 Md.App. at 650–51, 891 A.2d at 358 (apparent Asian–American eyewitness acknowledged difficulty picking defendant from photographic array because "if I see a whole bunch of African–American face[s], I'll probably miss, you know, I'm not very good at picking").

about her home, and by the hooded shirt that he wore. All of these factors were covered by the general, pattern eyewitness jury instruction given. The cross-racial identification instruction was not important.

Defense counsel freely argued his view of the implication of the cross-racial identification instruction he requested, without reference to the errant sentence tacked on by the judge at the State's request. The State did not argue what the significance of its added sentence meant to the case.

As the State points out in its brief, there was substantial evidence of Tucker's guilt quite apart from any racial implications. Ms. Auth had two opportunities to observe Tucker in or about her home as the crime unfolded. Her description of his physique and clothing aligned with his image on the videos from the Target stores. In addition, accounting for the explained mis-perception by the victim regarding the sex of Tucker's co-hort, Joyner, Ms. Auth positively identified Joyner as the other participant in the crime. Tucker's possession and use of the stolen credit cards in close temporal proximity to the break-in, and the extraordinary circumstances of the loss and destruction of Tucker's car, and the timing of his police report about that, endorsed the conviction. I am persuaded, beyond a reasonable doubt, that the errant sentence included in the cross-racial identification instruction given contributed nothing to the guilty verdict. Thus, I would affirm the judgment of this Anne Arundel County jury.

Judge MURPHY joins only Part II of this dissent. Judge ADKINS joins only that part of Part II addressed to harmless error.

Dissenting Opinion by MURPHY, Judge.

Although I agree with almost everything in Judge Harrell's dissenting opinion, I join only part II of the opinion, and write separately to express my opinion that—while the admissibility of "cross-racial identification" evidence should be decided in an *in limine* hearing—the *Frye/Reed* test may not be applicable to such evidence. Whether the *Frye/Reed* test does or does

not apply to "cross-racial identification" evidence should be decided in the first instance by the trial judge presiding at the *in limine* hearing.