973 A.2d 796

**Steven DIGGS**

v.

**STATE of Maryland.**

**Damon Lamar Ramsey**

v.

**State of Maryland.**

**Nos. 110, 147, Sept. Term, 2008.**

Court of Appeals of Maryland.

June 12, 2009.

other bar to one or more of the plaintiffs' claims. Those issues are not before us and we express no view.

Claudia A. Cortese, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for appellant.

Jessica V. Carter, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

In this opinion, we are called upon to determine whether Steven Diggs and Damon Lamar Ramsey, Appellants, are

entitled to new trials, because the judge who presided over their original proceedings acted like a co-prosecutor. It is clear in both of these cases that neither of the prosecutors presented the cases well, nor did the defense attorneys adequately represent their clients. Nevertheless, it is the presiding judge who is the subject of the questions presented. Diggs presents the following question:

1. Was Mr. Diggs deprived of a fair trial because the trial court failed to preserve an attitude of impartiality in his questioning of witnesses?

*Diggs v. State*, 406 Md. 443, 959 A.2d 792 (2008). In the companion bypass case,[1] Ramsey presents the following questions:

1. Did the trial court violate Damon Ramsey's constitutional right, under the Fifth and Fourteenth Amendments, to a fair trial where the trial judge acted as a second prosecutor and created a hostile courtroom environment for defense counsel in front of the jury, all of which suggested extreme bias against the defense?

2. Did the trial court violate Damon Ramsey's Sixth Amendment right to confront his accuser when the trial judge prevented defense counsel from challenging the credibility of the only police officer to testify against Damon Ramsey? [2]

*Ramsey v. State*, 406 Md. 744, 962 A.2d 370 (2008).

## I. Background

Steven Diggs was arrested and charged in Baltimore City with possession of marijuana, possession of marijuana with an intent to distribute, operating an unregistered motor vehicle, driving an uninsured vehicle, and driving without a license.

---

**1.** Both defendants noted a timely appeal to the Court of Special Appeals. We issued a writ of certiorari on our initiative before any proceedings in the intermediate appellate court to consider the issues presented in this appeal.

**2.** We need not address Ramsey's second question because of the disposition of his first question.

During the course of trial proceedings that occurred on June 1, 2007, Diggs was tried for possession of marijuana and possession of marijuana with an intent to distribute.[3] A jury found Diggs guilty on the charge of possession of marijuana, but was unable to render a unanimous decision on the charge of possession of marijuana with an intent to distribute. Diggs appeals from his conviction, alleging that he was denied a fair trial as a result of judicial bias, premised upon repeated and egregious behavior of the trial judge.

Diggs' first allegation of bias involves statements made by the judge during the direct examination of Detective John Giganti, who testified that he pulled Diggs' vehicle over because it had no license plates and thereafter discovered what he believed to be marijuana. When the prosecutor did not adequately lay the foundation for distribution of the marijuana, the judge pursued his inquiry more specifically about the packaging of the marijuana:

[STATE'S ATTORNEY:] Now, based on your expertise and experience, did you draw any conclusion as to the number of ziplock baggies recovered, the thirty-five baggies?

[DETECTIVE GIGANTI:] It was not for personal use. It was for street level distribution.

[STATE'S ATTORNEY]: And what about the money in the console?

THE COURT: Let me stay with that for a second. Why do you say that, sir, that it would be for street level distribution, not for personal use. What is about it—

[DETECTIVE GIGANTI:] Thirty-five bags of marijuana is a lot of personal use.

THE COURT: Okay. How about the individual packages?

---

3. On February 6, 2007, another jury found Diggs guilty on the charge of driving without a license. When the jury could not reach a verdict on the other charges of possession of marijuana and possession of marijuana with an intent to distribute, that judge, different from the instant one, declared a mistrial. The drug charges were re-tried in the instant case.

[DETECTIVE GIGANTI:] They are probably worth about ten dollars a piece.

THE COURT: And they're packaged individually?

[DETECTIVE GIGANTI:] They're packaged individually in small ziplock bags and the money again with small denominations other than a hundred dollar which would be consistent with ten dollar or dime bags as they're known on the street, of marijuana.

Diggs also contends that the judge interfered during Detective Georgiades' direct examination, because after Detective Georgiades could not recall telling Detective Giganti that he had previous contact with Diggs or previously had arrested Diggs, the judge allegedly attempted to rehabilitate the officer by stating: "It was over two and a half years ago, right? I mean we're talking November and the event would have been September '04 so okay."

Diggs further posits that the judge acted as a co-prosecutor during the direct examination of Diggs' first witness, Sherienne Diggs, Diggs' sister. The first instance of bias allegedly arose when Sherienne Diggs failed to recall various details about money and marijuana bags found in her car, and the judge pressed her for details:

[DEFENSE COUNSEL:] Okay. How much money? Did you count the money?

[MS. DIGGS:] Yeah, I counted it.

[DEFENSE COUNSEL:] How much was there?

[MS. DIGGS:] It was $1,800.

[DEFENSE COUNSEL:] Okay.

THE COURT: Do you remember the denominations of the bills?

[MS. DIGGS:] No, not exactly.

THE COURT: Do you remember if there were any hundred dollar bills in there?

[MS. DIGGS:] It might have been.

THE COURT: Not might have been. Do you remember one?

[DEFENSE COUNSEL:] Do you remember or don't? It doesn't matter.

[MS. DIGGS:] No, I don't remember.

THE COURT: You'd probably remember a hundred dollar bill, wouldn't you?

[MS. DIGGS:] Not if you see a lot of them all the time.

THE COURT: Did you see a lot of them that day?

[MS. DIGGS:] Later on that day I did.

THE COURT: How about earlier—

[MS. DIGGS:] I don't remember.

THE COURT: When he handed you the money you remember a lot of hundred dollar bills?

[MS. DIGGS:] I remember a lot of twenties.

THE COURT: A lot of twenties. Do you remember a hundred?

[MS. DIGGS:] I'm not sure. I think so. I'm not sure.

[DEFENSE COUNSEL]: Okay. So you don't recall?

[MS. DIGGS:] No.

During cross-examination, Diggs points to numerous instances in which the judge allegedly acted inappropriately. When the State questioned Ms. Diggs about her recollection of how long her brother had been staying at her house, she responded "[n]ot long" and "[m]aybe weeks." The judge intervened and again pressed for details:

THE COURT: Was it weeks or was it days? You have a very good memory on everything else.

THE COURT: Days.

[MS. DIGGS:] Days.

THE COURT: Days. How many days?

[MS. DIGGS:] Five, six.

THE COURT: What day of the week did this incident occur?

[MS. DIGGS]: I don't remember.

THE COURT: You don't remember if it was a week day or a weekend?

[MS. DIGGS]: I know it was a week day.

Moments later, the judge inquired into whether Ms. Diggs was "comfortable" with the information she provided regarding where she left her car keys, what time she got home, and what time she received the phone call that her brother had been arrested, while driving her car:

THE COURT: Do you remember where you left the keys on?

[MS. DIGGS:] They were on the table.

\* \* \*

THE COURT: What time did you go into your house?

[MS. DIGGS:] Around eight, eight-thirty.

THE COURT: What time were you planning to go out?

[MS. DIGGS:] Around nine, nine-thirty, ten o'clock.

THE COURT: What time did you get the call that he had been arrested?

\* \* \*

THE COURT: You are comfortable with that testimony?

[MS. DIGGS:] Yes.

THE COURT: And you left $1,500. Was the car locked?

[MS. DIGGS:] Yeah, the car was locked.

THE COURT: You left the money in the console?

[MS. DIGGS:] Yes. I did.

The judge's effort to cross-examine Ms. Diggs about the $1,500 found in the car continued:

THE COURT: How many times did he receive money—how many different times did you see him receive money from other people?

[MS. DIGGS:] I'm not exactly sure how many times.

THE COURT: Well, was it ten or—

[MS. DIGGS:] I don't know. I don't recall.

THE COURT: You don't know if it was ten. Do you know if it was twenty?

[MS. DIGGS:]   No.

THE COURT:  Do you know if it was thirty?

[MS. DIGGS:]   No, I don't.

THE COURT:  So you can't say any of that?

[MS. DIGGS:]   No, I can't.

THE COURT:  Okay. Well, you know it's more than one or two?

[MS. DIGGS:]   Yes.

THE COURT:  What did he do with that money?

[MS. DIGGS:]   He handed it to me and I put it in a bag.  I counted it and put it in a bag.

THE COURT:  You only put one hunk of money in the console, is that your testimony?

[MS. DIGGS:]   Yes.

The judge continued to press Ms. Diggs regarding why Ms. Diggs failed to inform the officers, immediately, that the drugs and money belonged to her boyfriend, as opposed to her brother:

THE COURT:  Well, you learned that night that he had been arrested, right?

[MS. DIGGS:]   Yes.

THE COURT:  And you learned he was arrested I guess for possession of drugs, right?

[MS. DIGGS:]   Yes.

THE COURT:  And the money?

[MS. DIGGS:]   Uh-huh.

THE COURT:  And you knew that he was innocent?

[MS. DIGGS:]   Yes.

THE COURT:  Did you go to the police right away and tell them this story that you're telling?

[MS. DIGGS:]   I tried to.

THE COURT:  What stopped you?

[MS. DIGGS:]   I tried to tell them.  I tried to tell them that it was [my boyfriend's].  I told [my boyfriend] to tell them that it was his.  The police was not—

THE COURT: I didn't ask you about [your boyfriend]. Did you go to the police or go to the State's Attorney—

[MS. DIGGS:] We went around there where they was arresting him at and we tried to tell him. I tried to tell the police. The police did not want to hear anything.

THE COURT: No, ma'am, did you tell either one of the officers who were here?

[MS. DIGGS:] That's what I just said.

THE COURT: You didn't listen to my question.

[MS. DIGGS:] I didn't tell those two officers, but it was more than those two officers out there.

THE COURT: Did you go to the police and say look this was not my brother's drugs or money? It belonged to [my boyfriend] with whom I was out collecting drug money that day?

[MS. DIGGS:] I didn't say all of that, but I told them that.

THE COURT: You're saying that here. And I guess my question is why didn't you say all of that at the time?

[MS. DIGGS:] You're not letting me finish.

THE COURT: Why did you wait two and a half years?

[MS. DIGGS:] You're not letting me finish saying what I was trying to say. I told the police that it wasn't his car. That is wasn't his drugs. That it wasn't his money. They were not trying to hear anything I had to say.

THE COURT: All right, Madame, I'd like you to answer my question, please. Why didn't you tell the police that you knew your brother was innocent because you and [your boyfriend] had been out delivering drugs that day? Why did you wait two and a half years to come in here and tell this story now?

At this point, defense counsel did object to the judge's inquisitory statement and suggested that the judge's conduct was inappropriate:

[DEFENSE COUNSEL:] Objection. It hasn't been two and a half years, Your Honor.

THE COURT: November—

**270**

[MS. DIGGS:]   I told the police—

THE COURT:  A year and a half, a year and a half.

[DEFENSE COUNSEL:]  Judge, you're testifying now. It has not been.  She has been telling this story for quite some time now and it hasn't—

THE COURT:  Before court?

[DEFENSE COUNSEL:]  Yes.

[MS. DIGGS:]  Yes, I told them that night.  That's what I am trying to tell you.

THE COURT:  You tell—

[DEFENSE COUNSEL:]  You're testifying.

THE COURT:  Excuse me.

\* \* \*

[DEFENSE COUNSEL:]  This is inappropriate.  You are not supposed to involve yourself in a case this way.

THE COURT:  Do you understand my comment?  You can say anything that you want at this bench.

[DEFENSE COUNSEL:]  No, Judge, if you're going to say in front of the jury that it was two and half years before you mentioned that, then I want them to hear, but this isn't the first time.  We have been doing this case many times before.

THE COURT:  [Counsel—]

[DEFENSE COUNSEL:]  Judge, you're giving them false information.  It's not true.

THE COURT:  [Counsel—]

[DEFENSE COUNSEL:]  Judge—

THE COURT:  You are on the verge—

\* \* \*

THE COURT:  You can say anything you want on the record but I want it at the bench.  Do you understand that?  Yes or no.

[DEFENSE COUNSEL:]   I understand.

THE COURT: All right, make sure. You can take exception to anything and everything I do. I have no problem with that, but I want it done at the bench not from counsel table. Do we understand each other?

[DEFENSE COUNSEL:] Yes, Judge, and I am objecting to you questioning her any further. You're badgering her.

THE COURT: I'm not badgering her.

[DEFENSE COUNSEL:] Yes, you are.

THE COURT: The woman is clearly—

[DEFENSE COUNSEL:] Don't you dare say that. You do not know. You were not there.

THE COURT: All right, thank you very much.

Diggs concedes that "[t]his was admittedly the only time the defense objected to the court's improper questioning of the defense witnesses and its improper insinuation that the defense witnesses were being untruthful."

In the companion case, Damon Ramsey was charged in the Circuit Court for Baltimore City with possession of cocaine, heroin, and marijuana, and possession with an intent to distribute cocaine and heroin, for which he was convicted after a two-day jury trial. Ramsey alleges that he was denied a fair trial as a result of judicial bias that began during a pre-trial suppression hearing, continued during voir dire and examination of witnesses and culminated during the course of instructing the jury.

Ramsey alleges that the judge's hostility toward defense counsel began when the judge empanelled the jury before holding the suppression hearing regarding Ramsey's motion that the drugs were illegally seized. Ramsey's motion to suppress the seized contraband, filed pursuant to Rule 4–252(a),[4] was heard by the judge after the jury was empanelled

---

4. Rule 4 252(a) states in part: "**Mandatory motions.** In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise ... (3) An unlawful search, seizure,

hereby failing to comply with Rule 4–252(g),[5] which states that motions "filed pursuant to this Rule shall be determined before trial."

Ramsey also argues that the judge badgered his attorney when he accused her of striking jurors based on their race:

THE COURT: Counsel, approach. Counsel approach, please.

(Whereupon, Counsel approached the bench and the following ensued:)

THE COURT: Counsel, according to my notes and looking at the array and the notes I took, it appears that maybe one third of this array is Caucasian. You have exercised five strikes and with the exception of number 699, which is juror number 12, all of them were Caucasian. Some of them, for instance, number 693, Mr. Aquino, didn't answer a question. The lady you just struck, Ms. Minghetti, didn't answer a question. What is your basis for striking Ms. Minghetti?

[DEFENSE COUNSEL:] Your Honor, I would state that in regards to number 693—

THE COURT: Why don't you pick 705, the one you just struck.

[DEFENSE COUNSEL:] 705, she is a director with a significant amount of education. I perceived her as to be a—I perceived her as to be a more dominant force in the group, a leader, and there are other jurors who I perceive based upon the defense in the case that I would seat in her preference.

---

interception of wire or oral communication, or pretrial identification...."

5. Rule 4–252(g) states in part that, "[m]otions filed pursuant to this Rule shall be determined before trial, and to the extent practicable, before the day of trial." A trial begins with the selection and empanelling of the jury. *See State v. Campbell*, 385 Md. 616, 634 n. 7, 870 A.2d 217, 227 n. 7 (2005); *Jourdan v. State*, 275 Md. 495, 507–08, 341 A.2d 388, 395–96 (1975). Although the Rule requires suppression motions to be heard pre-trial, the judge's act here, standing alone, is not necessarily reflective of judicial bias.

THE COURT: Well, you didn't strike Mr. Fitzgerald and he has the same degree of education. You didn't strike Miss Page, I don't think, 698.

[DEFENSE COUNSEL:] Well, I would say that I had already seated Mr. Fitzgerald and I—

THE COURT: I'm sorry—

[DEFENSE COUNSEL:] That would go to my not wanting another person to serve—

THE COURT: Is what you are saying, you don't want two people who educated but one is okay?

[DEFENSE COUNSEL:] No. I said in her position as a director I perceived her as to be—would come forth as a leader in the group.

THE COURT: All right.

[DEFENSE COUNSEL:] She—

THE COURT: I don't accept your explanations. I believe that race is entering into it and I find it unacceptable. So let's continue with the rest of the strikes, then I'll make a decision. Thank you.

[DEFENSE COUNSEL:] Your Honor, may I make a record?

THE COURT: Sure. Go ahead.

[DEFENSE COUNSEL:] I would state that in regards to the defense strike number one, she stated that she was never arrest-[sic] that her fiancé was in law enforcement. She was a white female but she said that she would-her fiancé as law enforcement never arrested an innocent man, and it was after multiple questioning that she changed her mind as to fairness. In regards to 693, a white male, his body language during voir dire—

THE COURT: He what?

[DEFENSE COUNSEL:]—and at other times I think he was—

THE COURT: He what?

[DEFENSE COUNSEL:] I'm saying a white male.

THE COURT: Yeah, that's not a crime.

[DEFENSE COUNSEL:]   I'm finishing my sentence.

THE COURT: Go ahead.

[DEFENSE COUNSEL:]   That when I looked at him and especially during voir dire, he was seated—separated himself from the rest of the group.   His body language in which he folded arms and his facial expression, I presumed that he was disinterested and did not want to be here.   In regards to 699—

THE COURT: I don't accept that at all.   Go ahead.

[DEFENSE COUNSEL:]   I am just saying my reasons as to my strikes I'm making.

THE COURT: Well, I don't accept that, but I'm stating for the record—

[DEFENSE COUNSEL:]   And the record.

THE COURT:—I don't believe you.   Go ahead, what's your next one?

\* \* \*

THE COURT: This is—you have challenged Juror Number 707, who is a white female and who is a school teacher, I think she said at Mount St. Agnes.   What's is your basis for striking her?

[DEFENSE COUNSEL:]   She said that her brother is a recently retired police officer.

THE COURT: And that it wouldn't influence her decision.

[DEFENSE COUNSEL:]   She has a brother who is a retired Police Officer.

THE COURT: All right.   This is your one, two, three, four, five, sixth strike.   Five out of the six have been Caucasians who are a distinct minority on this panel.   I would say they're 25 percent, a third tops.   I believe that your striking of Ms. Caplin is racially based, and I'm going to consider whether to reseat her.   All right.   Go ahead back to the table.

Ramsey asserts the judge's bias became clear during the suppression hearing when his attorney was cross-examining

Officer William Torbit, and the judge referred to defense counsel's hearing strategy as "pretty silly":

[DEFENSE COUNSEL:] [To Witness] Okay. Do you recall making any cell phone calls to try to ascertain as to Mr. Ramsey's residence?

[OFFICER TORBIT:] No, I didn't. Everything—do I—

THE COURT: Why is that relevant? Hold on. Why is that possibly relevant?

[DEFENSE COUNSEL:] Your Honor, the officer's credibility is relevant and there's issues in regards to—

THE COURT: How is that—what are you going to establish about his credibility—

[DEFENSE COUNSEL:]—the officer's credibility.

THE COURT:—about whether he made a call about his residence? How is that going to reflect on credibility?

[DEFENSE COUNSEL:] It goes to his recollection, Your Honor, and as to what he did or did not include in his statement of probable cause.

THE COURT: Go ahead, but I think it's pretty silly.

Ramsey also complains about the judge's intervention at trial during the direct examination of Officer Torbit, whereby key elements of the State's case were elicited. The judge, in the first instance, queried the Officer regarding times and locations:

[STATE'S ATTORNEY:] Did there come a time that you saw Mr. Ramsey again?

[OFFICER TORBIT:] Yes, ma'am.

[STATE'S ATTORNEY:] And where was that?

[OFFICER TORBIT:] In the—

THE COURT: Do we have a time—what time was it saw him the first time, officer.

[OFFICER TORBIT:] It was between 7:30 and 8 o'clock

THE COURT: In the evening?

[OFFICER TORBIT:] Yes, sir.

THE COURT: Okay. What time was it on the second time?

[OFFICER TORBIT:] Am—

THE COURT: Approximately.

[OFFICER TORBIT:]—approximately maybe 20, 30 minutes later.

THE COURT: Okay. Where did you see him 20 or 30 minutes later?

[OFFICER TORBIT:] In the 500–block of Laurens Street.

THE COURT: Where is that in relationship to where you saw him earlier?

[OFFICER TORBIT:] That's in between—

THE COURT: How far is it?

[OFFICER TORBIT:] Let's just say half a block.

THE COURT: Half a block.

[OFFICER TORBIT:] It was around the corner.

THE COURT: All right. Around the corner?

[OFFICER TORBIT:] Yes, sir.

At a bench conference during the Officer's direct testimony, the judge also asked the prosecutor if she intended to elicit identification testimony, but before she had the opportunity to ask the question, the judge interjected:

THE COURT: All right. Now, you have mentioned Mr. Ramsey. Do you see Mr. Ramsey in the courtroom?

[OFFICER TORBIT:] Yes, sir, I do.

THE COURT: Would you point to him please.

[OFFICER TORBIT:] Right here, sir.

THE COURT: For the record he's identified the Defendant seated at the trial table.

Ramsey also points to another juncture during Officer Torbit's direct testimony in which, in response to a defense objection to a line of questioning, the judge not only overruled the objection, but pursued the line of questioning:

[STATE'S ATTORNEY:] And the substance inside, how are you able to recognize what it is?

[OFFICER TORBIT:] It's a white powder substance. It's cocaine.

[DEFENSE COUNSEL:]  Objection.

THE COURT:  Overruled.  What does it appear to be, officer?

[OFFICER TORBIT:]  This appears to be cocaine.

THE COURT:  Based on what?  What's your basis for that?  Appearance?

[OFFICER TORBIT:]  Based on the, on the texture, the color is white.

THE COURT:  And it's packaged in the vials?  That's how cocaine is generally sold?

[OFFICER TORBIT:]  Cocaine is normally sold in.

During further questioning by the prosecutor, the judge expanded the scope of the inquiry:

[STATE'S ATTORNEY:]  Do you remember the denominations of [the found money]?  Small bills, large bills?

[OFFICER TORBIT:]  It was small bills.

[STATE'S ATTORNEY:]  Okay.  Did, does that have any significance to you?

[OFFICER TORBIT:]  Yes, ma'am, it does.

[STATE'S ATTORNEY:]  What's that?

[OFFICER TORBIT:]  It tells me that street level narcotics is being sold.

THE COURT:  Why?

[OFFICER TORBIT:]  Because of the money being, you know, being balled up in pockets and being, you know, ones and ten's.  Just not a big lump sum.

THE COURT:  Small bills—

[OFFICER TORBIT:]  Small bills.

THE COURT:—used commonly used in street level transactions?

[OFFICER TORBIT:]  Yes, sir.

Ramsey also insists that the judge bulwarked the element of intent to distribute, after the prosecutor had finished the Officer's direct questioning:

[STATE'S ATTORNEY:] I have no further questions at this time, Your Honor.

THE COURT: May I ask one and then if you want to ask—

[STATE'S ATTORNEY:] Certainly, Your Honor.

THE COURT: Officer, in terms of the vial, he had over a hundred vials, right?

[OFFICER TORBIT:] Yes, sir.

THE COURT: And you said they were $10. So this would be—they're sold on the street as one or two or three vials?

[OFFICER TORBIT:] Yes, sir.

THE COURT: Is that correct?

[OFFICER TORBIT:] $10 per vial.

THE COURT: Per vial?

[OFFICER TORBIT:] Yes, sir.

THE COURT: So these were packaged for, these vials were the packaging for individual sales?

[OFFICER TORBIT:] Yes, sir.

THE COURT: All right. And the heroin, the gel caps again that is sold as one cap or two caps or three?

[OFFICER TORBIT:] One cap yes, sir. One cap for $10.

THE COURT: $10.

[OFFICER TORBIT:] Yes, sir.

THE COURT: And the gel caps here were packaged for sale?

[OFFICER TORBIT:] Yes, sir.

During cross-examination of the Officer,[6] Ramsey's attorney attempted to impeach his recollections about what happened, by eliciting testimony about prior meetings with the prosecutor, but Ramsey alleges those attempts were undermined by the judge's sua sponte intervention and comments to jurors:

---

**6.** The second question presented in this appeal, which we do not address separately, is based upon allegations of judicial bias because of limitations imposed during the cross-examination of the Officer.

[DEFENSE COUNSEL:] But not only you had a chance to look at it, you had a chance to discuss with [the state's attorney] that in regards to where and what on that photo?

[OFFICER TORBIT:] I'm pretty sure she can't tell me anything about that block. I know everything about it.

[DEFENSE COUNSEL:] But you and she did discuss this photo this morning.

[OFFICER TORBIT:] She can't tell—I told her about the block.

[DEFENSE COUNSEL:] Okay. The question was that you and [the state's attorney] discussed the photo?

[STATE'S ATTORNEY:] Objection.

THE COURT: Counsel, I think it's been established that he discussed the photograph with [the state's attorney]. Ladies and gentlemen, most lawyers, good lawyers, talk to their witnesses.

[DEFENSE COUNSEL:] I would object, Your Honor.

THE COURT: Excuse me, counsel. Most lawyers talk to a witness before they put them on the witness stand. It's not, you know, hand signals or anything else. It's perfectly appropriate for any lawyer to talk to any witness before they put them on the witness stand, and to review their testimony with them. It's absolutely appropriate.

[DEFENSE COUNSEL:] Your Honor, may we approach?

THE COURT: Certainly.

(Whereupon, Counsel approached the bench and the following ensued:)

[DEFENSE COUNSEL:] Your Honor, in the light of the Court's comment, which I would say, one, would be essentially buttressing the credibility of the prosecutor, but also, two, I would ask the Court to ask the—

THE COURT: Do you have a motion?

[DEFENSE COUNSEL:]—to explain to the jury in regards to sequestration.

THE COURT: Counsel, I don't know what—I am denying your request. Anything further?

[DEFENSE COUNSEL:]   No, Your Honor.

THE COURT:  Thank you.

Ramsey further complains that after the prosecutor objected to one of Ramsey's attorney's questions in recross, the judge criticized Ramsey's counsel, prejudicially demeaning her status as a lawyer by referring to her as "young lady":

THE COURT:  Just a minute.  I did not finish, young lady. You are going to be out of here in a minute.  Don't interrupt me.  When you get my ruling, you obey my ruling, and if you think the facts have changed because of something she said or did, then you approach the bench and you ask me to reconsider or change my ruling on the basis of that.  You do not take it upon yourself to go into an area that I have forbidden.  Do you understand my ruling?

[DEFENSE COUNSEL:]   I understand your ruling, Your Honor.

. . .

\* \* \*

THE COURT:  . . . You have your record. . . .

Ramsey also complains of judicial misconduct, after Dr. Muhammed Majid had testified and had been cross-examined regarding his opinion that a bag found contained cocaine, heroin, and marijuana.  Specifically, after the prosecutor declined to engage in redirect, the judge asked Dr. Majid to retake the stand and proceeded to establish the drugs' chain of custody:

THE COURT:  . . . Doctor, let me just—why don't you retake the stand.  Show him that.  Let me show you the second page of exhibit 4, are you familiar with that—

[DR. MAJID:]   Yes.

THE COURT:—form?  Can you tell the ladies and gentlemen what the second page of the—the first page shows your conclusions, right?

[DR. MAJID:]   Right.

THE COURT:  Okay.

[DR. MAJID:] Actually the second page is the chain of custody.

THE COURT: Is the what, chain of custody?

[DR. MAJID:] Of custody form.

THE COURT: That shows where—who has custody of the drugs at each time?

[DR. MAJID:] Right.

THE COURT: So there's a record there of the drugs from the time they're taken—

[DR. MAJID:] Yes.

THE COURT:—until they get to you.

[DR. MAJID:] Right.

■■ Finally, Ramsey also complains that the judge failed to strictly adhere to pattern jury instruction 3. 10, governing credibility, to which the judge added his own language:

THE COURT: Exceptions?

[STATE'S ATTORNEY:] No, Your Honor.

THE COURT: [Defense counsel?]

[DEFENSE COUNSEL:] Yes, Your Honor.

* * *

[DEFENSE COUNSEL:] In regards to 3.10, credibility of the witnesses—

THE COURT: Yes.

[DEFENSE COUNSEL:]—the Court added an addition referring to intentional error or falsehood. There's—

THE COURT: 1 gave that one exactly. This is the current volume. Oh, oh, oh, you're right. You're right. You're right. Yes, I did. You take exception to that?

[DEFENSE COUNSEL:] I do.

THE COURT: Your exception is noted. Thank you. I said intentional but I did add something outside of 3.10. *I do it in every case.*

(Emphasis added). The additional language added, resulted in the instruction reading:

Credibility of witnesses. You are the sole judge of whether a witness should be believed. In making this decision, you may apply your own common sense and everyday experiences.

In determining whether a witness should be believed, you should carefully judge all the testimony and evidence and the circumstances under which the witness testified.

You *may* consider such factors as—*and I'm going to list some of these*—the witness' behavior on the witness stand and manner of testifying, did the witness appear to be telling the truth, *did* the witness *have the* opportunity to see or hear the things about which *he testified,* the accuracy of the witness' memory, does the witness have a motive not to tell the truth or *does the witness lack the motive,* does the witness have an interest in the outcome of the case, was the witness' testimony consistent, was the witness' testimony supported or contradicted by evidence that you believe, whether and the extent to which the witness' testimony in Court differed from statements made by the witness on any prior occasion.

*Inconsistencies or discrepancies in the testimony of a witness may, or between testimony of different witnesses, may or may not cause you to disbelieve or discredit such testimony. Two or more persons witnessing an incident or a transaction may simply see or hear it differently.*

*Innocent misrecollection like failure of recollection is not uncommon.*

*In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or an insignificant detail, and consider whether the discrepancy results from innocent error or from intentional falsehood.*

You need not believe any witness even if the testimony is uncontradicted. You may believe all, part or none of the testimony of any witness.

(Italics added).[7]

## II. Discussion

Whether the trial judge's behavior was so egregious so as to deprive either or both Diggs and Ramsey of their due process rights to a fair and impartial trial is the gravamen of these cases. Diggs argues the trial court's lack of impartiality, continuous questioning of witnesses beyond the acceptable "clarification" questions and implications to the jury that the witnesses were lying, resulted in fundamental errors, which deprived him of his right to a fair trial. Similarly, Ramsey argues that the trial judge's pervasive questioning of witnesses reflected bias, and that the judge acted as a "second prosecutor" by, among other things, eliciting favorable testimony for the prosecution and establishing the elements of the crime. In nearly every instance of alleged judicial misconduct, neither Diggs nor Ramsey objected. Although Diggs' and Ramsey's attorney only objected once to the pattern of judicial behavior, both argue, nevertheless, that it would have been futile or unprofessional to continuously object, and that we should reach their arguments in order to serve the ends of justice.

The State conversely argues that Diggs and Ramsey did not object to the judge's questioning of witnesses and, therefore,

---

**7.** The language in italics indicates the deviation from the pattern jury instructions. Jury instructions are governed by Rule 4–325, which states in part that "[t]he court may ... instruct the jury as to the applicable law and the extent to which the instructions are binding." Rule 4–325(c). Generally, we are concerned only with whether the additional language is a correct statement of the law. *See Tucker v. State,* 407 Md. 368, 379, 965 A.2d 900, 908 (2009) (holding it was error for the trial judge to give an instruction requested by the State because it was an incorrect statement of the law).

The additional language is not an inaccurate statement of the law, as articulated in *Jackson v. State,* 69 Md.App. 645, 662, 519 A.2d 751, 759 (1987), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987), in which our intermediate appellate court approved an instruction stating that: "inconsistencies and discrepancies [are] factors that may cause the testimony of a witness to be discredited ... [and] in weighing any discrepancy the jury should consider whether it involved an important matter and whether it resulted from innocent error or intentional falsehood."

failed to preserve various issues for review pursuant to Rule 8–131(a), which provides that we ordinarily will not address an issue unless "it plainly appears by the record to have been raised in or decided by the trial court."[8] Alternatively, the State argues that even if we reach the issues raised, a trial judge has wide discretion to ask questions to clarify issues, and the judge's questions were legitimate efforts to sharpen issues and clarify points for the jury. The State argues, finally, that even if the judge erred, that we should find harmless error.

Before we reach the merits of the two cases at bar, however, we must address the preservation issue. Those issues to which Diggs and Ramsey objected were clearly preserved.[9] In *Diggs*, the defense counsel concededly objected only once after an exchange between the judge and Sherienne Diggs, during which the judge questioned her regarding the timing of her informing the police that the drugs and money belonged to her boyfriend rather than her brother: "Why did you wait two and a half years to come in here and tell this story now?"

8. Rule 8–131(a) states, "[T]he issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."

9. Rule 4–323(a) states that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." *See also Conyers v. State*, 354 Md. 132, 150, 729 A.2d 910, 919 (1999) (stating that "[t]he rules for preservation of issues have a salutary purpose of preventing unfairness and requiring that all issues be raised in and decided by the trial court, and these rules must be followed in all cases ....") *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Graham v. State*, 325 Md. 398, 411, 601 A.2d 131, 137 (1992) (holding failure to object amounted to waiver of the objection). In this regard, in *Elmer v. State*, 239 Md. 1, 9, 209 A.2d 776, 781 (1965), we discussed the history of the predecessor to Rule 4–323 and held that an exception to the preservation rule will be recognized when "the accused was not afforded a fair and impartial trial" and was "denied due process of law."

Diggs' attorney objected and stated it had not been two and a half years, to which the judge replied, "a year and a half, a year and a half." Defense counsel then opined: "Judge, you're testifying now" and objected.

In *Ramsey*, the defense objected after the judge remarked to the jury that "most lawyers, good lawyers, talk to their witnesses." The judge did not rule on the objection, but opined to the jury about how it is "perfectly appropriate for any lawyer to talk to any witness before they put them on the witness stand. . . ." At the bench, Ramsey's counsel remonstrated that the judge's comment was "essentially buttressing the credibility of the prosecutor" and asked the judge to explain sequestration to the jury. The judge denied that request.

The State argues that our review must end at this juncture because the aforementioned questions and comments were subject to objection and that these, alone, would not constitute reversible error. The State contends that all other issues raised by Diggs and Ramsey regarding inappropriate comments by the judge were not preserved for review, because defense counsel did not object. In contrast, Diggs and Ramsey argue that it would have been futile or unprofessional to continuously object.

In the past, when addressing the issue of judicial bias, we have inferred that unobjected to behavior can be reviewed by utilizing structural error review. *See Harris v. State*, 406 Md. 115, 130, 956 A.2d 204, 213 (2008); *Redman v. State*, 363 Md. 298, 303 n. 5, 768 A.2d 656, 659 n. 5 (2001) ("It is because structural error is impossible to quantify that it defies analysis by the harmless error standard. . . . [T]he Supreme Court has found an error to be structural and subject to automatic reversal in a very limited number of cases. . . . Such defects include . . . a judge who is not impartial, *see Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).").[10] We also

---

10.  In *Redman v. State*, 363 Md. 298, 303 n. 5, 768 A.2d 656, 659 n. 5 (2001), we quoted *Arizona v. Fulminante*, 499 U.S. 279, 307–09, 111

have reviewed allegations of judicial bias without necessarily articulating our bases or requiring repeated objections; in *Jackson v. State*, 364 Md. 192, 772 A.2d 273 (2001), despite the failure to object during sentencing to comments made by the judge, we reversed the conviction and held that the trial judge's comments exceeded the outer limit of a judge's broad discretion and amounted to impermissible sentencing criteria.

More frequently, however, we have invoked the "plain error" doctrine in support of our review of allegations of unobjected to judicial bias. Plain error is "error which vitally affects a defendant's right to a fair and impartial trial." *State v. Daughton*, 321 Md. 206, 211, 582 A.2d 521, 523 (1990), citing *State v. Hutchinson*, 287 Md. 198, 202, 411 A.2d 1035, 1037–38 (1980). We have recognized the boundaries of that error to which we apply our review as that which is "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Abeokuto v. State*, 391 Md. 289, 327, 893 A.2d 1018, 1040 (2006), quoting *Richmond v. State*, 330 Md. 223, 236, 623 A.2d 630, 636 (1993) (citations omitted). *See also Rubin v. State*, 325 Md. 552, 588, 602 A.2d 677, 694 (1992); *Hutchinson*, 287 Md. at 203, 411 A.2d at 1038. We will "intervene in those circumstances only when the error complained of was so material to the rights of the accused as to amount to the kind of prejudice which precluded an impartial trial." *Trimble v. State*, 300 Md. 387, 397, 478 A.2d 1143, 1148 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985). In each case, we will "review the materiality of the error in the context in which it arose, giving due regard to whether the error was purely technical, the product of con-

---

S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991) for the definition of structural error:

A structural error is an error that affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 111 S.Ct. at 1265, 113 L.Ed.2d 302. Such errors affect the entire trial process itself, affecting the conduct of the trial from beginning to end, *see id.* at 309, 111 S.Ct. at 1265, 113 L.Ed.2d 302, and "necessarily render a trial fundamentally unfair."

scious design or trial tactics or the result of bald inattention."
*Hutchinson*, 287 Md. at 203, 411 A.2d at 1038.

Utilizing a plain error analysis, was the judge's conduct in
the instant cases so compelling as to warrant reversal in both
cases? We must answer in the affirmative.

In our most recent case in which we addressed judicial
partiality, *Archer v. State*, 383 Md. 329, 859 A.2d 210 (2004),
we reviewed the appropriateness of a judge's directions to a
witness and stated that the trial judge "departed from a
neutral judicial role and acted as an advocate" when he
persuaded a reluctant witness to testify. *Id.* at 347, 859 A.2d
at 221. We observed that the three warnings of contempt, a
phone call to another judge in the presence of the witness, the
threat of life imprisonment as a sanction for contempt, the
threat that the other judge would impose the longest possible
penalty for contempt, and the advice on how the witness could
testify was "excessive and improper." *Id.* at 352, 859 A.2d at
224. We held that, as a matter of Maryland nonconstitutional
criminal procedure, the trial judge's "improper use of judicial
authority" through admonitions and partial conduct contribut-
ed to the defendant's convictions, thereby denying the defen-
dant his due process right to a fair trial. *Id.* at 360, 859 A.2d
at 229. In reaching our holding, we reviewed our jurispru-
dence and reiterated that, "[i]t is well settled in Maryland that
fundamental to a defendant's right to a fair trial is an impar-
tial and disinterested judge." *Id.* at 356, 859 A.2d at 227,
citing *Jackson*, 364 Md. at 206, 772 A.2d at 281, quoting
*Jefferson–El v. State*, 330 Md. 99, 105, 622 A.2d 737, 740
(1993).

In reflecting upon our jurisprudence supporting this tenet,
we noted:

> It has often been said that a defendant's due process right
> to a fair trial, minimally, means a fair and impartial judge.
> A criminal defendant has a Sixth Amendment right,
>
> > to confront a witness for the prosecution for the purpose
> > of cross-examination or to present his own witnesses to
> > establish a defense. Both rights are fundamental ele-

ments of due process of law, and a violation of either could hamper the free presentation of legitimate testimony. . . . If a defendant's attorney is intimidated by a trial judge's unwarranted or unduly harsh attack on a witness or the attorney himself, then the defendant's constitutional right to effective representation guaranteed by the Sixth Amendment is impinged. . . . A . . . final interest of a criminal defendant that may be affected by a trial judge's manner of warning a witness is the defendant's due process right to trial before an impartial tribunal. A fair jury in jury cases and an impartial judge in all cases are prime prerequisites of due process. It is a maxim that every litigant, including the State in criminal cases, is entitled to nothing less than the cold neutrality of an impartial judge. . . .

*North Carolina v. Rhodes,* 290 N.C. 16, 224 S.E.2d 631, 636–38 (N.C.1976) (internal citations and quotes omitted).

In *Jackson v. State,* 364 Md. 192, 772 A.2d 273 (2001), we reviewed the appropriateness of a trial court's comments during a judicial hearing. In that case, this Court held that a trial court's comments at sentencing exceeded the outer limits of a judge's broad discretion in sentencing when the comments could cause a reasonable person to question the judge's impartiality. *Id.* We noted that " '[a] defendant in a criminal case has a right to a fair trial. It is well settled in Maryland that fundamental to a defendant's right to a fair trial is an impartial and disinterested judge.' " *Id.* at 206, 772 A.2d at 281 (quoting *Jefferson–El v. State,* 330 Md. 99, 105, 622 A.2d 737, 740 (1993)). Not only does a defendant have the right to a fair and disinterested judge but he is also entitled to a judge who has "the appearance of being impartial and disinterested." *Jackson,* 364 Md. at 207, 772 A.2d at 281. *See also, Crawford v. State,* 285 Md. 431 at 451–52, 404 A.2d 244 at 254–55 (1979) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.")).

Although we were discussing sentencing in the *Jackson* case, we think the standard we enunciated there is applicable. " 'If a judge's comments during [the proceedings] could cause a reasonable person to question the impartiality of the judge, then the defendant has been deprived of due process and the judge has abused his or her discretion.' " *Jackson*, 364 Md. at 207, 772 A.2d at 281–282 (quoting *Nebraska v. Pattno*, 254 Neb. 733, 579 N.W.2d 503, 509 (1998)).

*Archer*, 383 Md. at 356–57, 859 A.2d at 226–27 (ellipses in original). In *Archer* we relied on *Jefferson–El*, in which, based upon expressed displeasure with a jury verdict in which the defendant was acquitted of several charges, the trial judge's lack of impartiality and bias were held to have prejudiced a criminal defendant's right to a fair and impartial judicial proceeding and warranted our intervention. In *Jefferson–El*, 330 Md. at 106, 622 A.2d at 741 we stated:

It is beyond dispute that the trial judges perform a unique and persuasive role in that system: confidence in the judiciary is essential to the successful functioning of our democratic form of government.

It is because judges occupy a distinguished and decisive position that they are required to maintain high standards of conduct. Their conduct during a trial has a direct bearing on whether a defendant will receive a fair trial because their opinion or manifestations thereof usually will significantly impact the jury's verdict. In addition, if the defendant has elected to be tried by a jury, it is the province of that jury to decide the guilt or innocence of the defendant.

*Jefferson–El*, 330 Md. at 106, 622 A.2d at 741 (internal citations and quotations omitted).

In *Jackson v. State*, 364 Md. 192, 772 A.2d 273 (2001), we reviewed a judge's comments during sentencing and held that the comments "exceeded the outer limit of a judge's broad discretion in sentencing and therefore amounted to the application of impermissible sentencing criteria." *Id.* at 195, 772

A.2d at 274. At sentencing, the judge used words such as "ghetto," "jungle," "animals," and "people like Mr. Jackson" who come "from the city," which may have reflected racial bias or the appearance of racial bias. *Id.* at 201, 772 A.2d at 278. Although we could not affirmatively declare that the judge was motivated by impermissible considerations reflecting ill-will or prejudice, we found that these could have been inferred. We reversed and remanded the case for a new trial before a different judge. *Id.* at 208, 772 A.2d at 282.

In *Marshall v. State*, 291 Md. 205, 434 A.2d 555 (1981), we reviewed a trial judge's admonitions to a witness during cross examination, when the jury was not in the courtroom, and held that the following admonishment constituted error:

THE COURT: Now, Mr. Marshall, you are under oath. If you fail to tell the truth, you can be charged with perjury. You took the witness stand in front of me the 13th of November.

THE WITNESS: Yes, sir.

THE COURT: With regard to the statement which you had given Trooper Hornung. Now, during the course of that hearing you testified that you told him what had happened.

THE WITNESS: Yes, I did.

THE COURT: And I asked you if you told him the truth, and you said you did. Now, this was after Trooper Hornung had testified precisely as he did in this case. Now, you are trying now to testify differently from what you said on November the 13th, and I'll issue a bench warrant charging you with perjury if you persist.

*Id.* at 209, 434 A.2d at 558. We noted that whenever a court "takes it upon itself to warn a witness or the defendant in a criminal case about the consequences of failing to testify truthfully ... [the court] is swimming in treacherous waters." *Id.* at 211, 434 A.2d at 558.

In another case similar to the present case, *Vandegrift v. State*, 237 Md. 305, 206 A.2d 250 (1965), we examined a trial judge's "cross-examination" of a witness, and stated that the "questioning by the trial judge showing his disbelief of the

witness' testimony was beyond the line of impartiality over which a judge must not step." *Id.* at 311, 206 A.2d at 254. The trial judge repeatedly challenged the witness' statements and reminded the witness that he was subject to indictment for perjury, thereby suggesting his disbelief in the witness' testimony:

By the Court: * * *

Q. Do you know the bartender, Richard Dodson?

A. No, sir.

Q. You don't know him?

A. No, I don't know him personally. I know—

(The Court) Bring Mr. Dodson in here a moment, please.

By the Court:

Q. Now I want to tell you that you are under oath. Do you understand that?

A. Yes, sir.

Q. And do you realize that you are subject to punishment, I mean subject to indictment for perjury if you don't tell the truth?

A. Yes, sir.

And later in the testimony:

By the Court:

Q. And you persist in saying that you didn't see Mr. Hill thrown to the ground twice?

A. Yes, sir.

Q. And you didn't see this accused person jump on his back.

A. No, sir.

Q. And you were there all the time?

A. Yes, sir.

*Id.* at 310, 206 A.2d at 253. After reviewing all of the testimony, we presumed that the trial judge's disbelief influenced the jury, "whose function it was as the triers of the facts to determine the credibility of the witnesses," and determined that the trial judge's questions crossed a line and "taken as a

whole or even individually amounted to a manifestation of disbelief of the witness." *Id.* at 310, 206 A.2d at 253.

These cases differ from the appropriate circumstances in which a judge may ask questions to clarify an answer or comment.[11] In *Marshall,* 291 Md. at 213, 434 A.2d at 560, we emphasized that the judge is to maintain neutrality, manage his/her questioning of witnesses, and let the attorneys clarify issues through cross-examination:

> In sum, while we agree with the court below that a judge presiding over a jury trial has the right to interrogate witnesses in an effort to clarify the issues, we stress that he should exercise this right sparingly. It is a far more prudent practice for the judge to allow counsel to clear up disputed points on cross-examination, unassisted by the court. In this manner, the judge is most likely to preserve his role as an impartial arbiter, because he avoids the appearance of acting as an advocate.

In the cases *sub judice,*[12] however, the judge intervened with inappropriate questions and comments throughout the trials.

---

11. In addressing in this opinion the relative propriety of comments and questions from the bench in the course of a criminal trial where both sides are represented by counsel, our analysis and the context in which it occurs do not consider how the role of a trial judge may be viewed when he or she is confronted with self-represented litigants in either a criminal or civil trial. There is much contemporary discussion regarding the proper role of a trial judge where one side or both sides in a case involve self-represented litigants. Consideration of the proper judge-litigant dynamic for those situations is reserved for another day and perhaps in a different modality than appellate review.

12. The challenged questions in the present cases can be contrasted with his more appropriate "clarifying" questions. In *Diggs,* for example, the judge asked questions to clarify a response, which may have been unclear to the jury:
   [STATE'S ATTORNEY:]  . . . Were you alone or with any others?
   [DETECTIVE GIGANTI:]  I was a single unit
   [STATE'S ATTORNEY:]  Okay.
   THE COURT:  That means alone?
   [DETECTIVE GIGANTI:]  Yes.
   The judge also proffered clarifying questions during Ramsey's trial:
   [STATE'S ATTORNEY:]  And how do you know that those are the narcotics you received on that day?

■■ In *Diggs*, the judge rehabilitated the prosecutor's case by laying the foundation for the distribution charge during questioning of the lead detective, Detective Giganti; rehabilitated Detective Georgiades after he appeared confused; questioned Sherienne Diggs regarding the denominations of bills, where she put her keys, and the timing of her telling the police that the car and drugs belonged to her boyfriend rather than her brother; commented to Ms. Diggs, "You have a very good memory on everything else," and questioned her whether she was comfortable with her testimony, all of which bolstered the State's case while implying a disbelief in the defense and created the aura of partiality in front of the jury. Similarly, in *Ramsey*, the judge elicited key elements of the State's case from Officer Torbit including the timing and in-court identification of the defendant; established key aspects of the officer's testimony regarding the drugs; elicited testimony regarding the elements of intent to distribute after the prosecutor finished questioning the witness; made comments to the jurors to bolster the integrity of the prosecutor that "most lawyers, good lawyers, talk to their witnesses," and established the chain of custody of the drugs after the prosecutor failed to do so. In so doing, the judge acted as a co-prosecutor, and his behavior exceeded "mere impatience" and crossed the line of propriety, creating an atmosphere so fundamentally flawed as to prevent Diggs and Ramsey from obtaining fair and impartial trials.

Neither Diggs' nor Ramsey's counsel interjected objections regarding most instances of repeated and egregious behavior. On appeal, Diggs and Ramsey assert, however, that continuous objections would have been futile and unprofessional and would have created more hostility and tension.

---

[OFFICER TORBIT:] Because when I take them to ECU, there's a property number given to the---
THE COURT: Wait a minute, officer. Nobody here knows what ECU is.
[OFFICER TORBIT:] Okay. My fault. I'm so sorry. Okay.
THE COURT: What is ECU?
[OFFICER TORBIT:] That's the evidence control unit. . . .

In *Johnson v. State*, 352 Md. 374, 722 A.2d 873 (1999), defense counsel encountered similar judicial behavior and engaged in continuous objections, which provoked the ire of the judge. Negative interactions between the trial judge and defense counsel before the jury throughout the trial in the form of interruptions, insults, and other forms of inappropriate behavior provoking contempt citations, were determined to be inappropriate. We held that "[u]nder the totality of the circumstances, the cumulation of these abrupt and arbitrary comments, unnecessary interrogations, premature rulings from the bench, and the arrest and citations of the defense attorney in the presence of the jury clearly violated petitioner's right to a fair trial"; we were particularly concerned with defense counsel's arrest for contempt of court before the jury: this "painted defense counsel in such a negative light that it deprived petitioner of a fair trial." *Id.* at 388, 393–94, 722 A.2d at 880, 882. We construed the judge's behavior as biased and in reversing the conviction stated that judges, unlike other people, have "the sovereign power to punish, to deprive persons of their liberty and property, and that alone requires that they restrain their irritation." *Id.* at 389, 722 A.2d at 880 (citations and quotations omitted). Therefore, repeated objections can lead to unprofessional conduct on the part of both judge and lawyer and exacerbate tension in the courtroom.

■ In recognizing that repeated objections in the present cases may have led to the same tense atmosphere, we would remonstrate that ordinarily the failure to object will only be countenanced in those instances in which the judge exhibits repeated and egregious behavior of partiality, reflective of bias. Failure to object in less pervasive situations may not have the same result, nor will we necessarily intervene.

We deem it crucial to note that prosecutors are responsible for developing their cases, and that defense counsel must object in order to seek correction by the judge and preserve the issue for appeal. Nevertheless, in the instant cases, the judge's egregious and repeated behavior reflecting partiality and bias during these trials denied Diggs and Ramsey their

right to fair and impartial trials, to which a harmless error review is unavailing. As a result, we reverse these convictions and remand the cases for new trials before a different judge.

**IN BOTH NO. 110 AND NO. 147, THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY ARE REVERSED. BOTH CASES ARE REMANDED TO THAT COURT FOR NEW TRIALS BEFORE A DIFFERENT JUDGE; COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**

MURPHY, J., Dissents.

Dissenting Opinion by MURPHY, J.

In my opinion, neither Mr. Diggs nor Mr. Ramsey is entitled to a new trial. From my review of the records, I disagree with the majority's conclusion that, "the judge's egregious and repeated behavior reflecting partiality and bias during these trials denied Diggs and Ramsey their right to fair and impartial trials[.]"

### *State v. Diggs*

In this case, the jurors were entitled to know whether Sherienne Diggs had ever provided an agent of the State with the information she provided during her direct examination. I would not grant a new trial on the ground that the Circuit Court asked questions that the prosecutor was clearly entitled to ask. In *United States v. Ostendorff*, 371 F.2d 729 (4th Cir.1967), the United States Court of Appeals for the Fourth Circuit stated:

[The trial judge] is not a bump on a log, nor even a referee at a prizefight. He has not only the right, but he has the duty to participate in the examination of witnesses when necessary to bring out matters that have been insufficiently developed by counsel. He is in charge of the trial and may exercise his control to assure that the jury is not mislead by unfair phrasing of questions by counsel. E.g., *Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 92 L.Ed. 468 (1948) [Frankfurter, J., dissenting]; *United States v. Godel*,

361 F.2d 21 (4th Cir.1966); *Simon v. United States,* 123 F.2d 80 (4th Cir.), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941). "A trial judge, who is after all 'the only disinterested lawyer connected with the proceeding', has the duty to help make clear to the jury the facts and circumstances pertinent to the case. 'He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other.'" *United States v. Godel, supra,* 361 F.2d at 24 [quoting from *Simon v. United States, supra,* 123 F.2d at 83].

*Id.* at 732.

Moreover, the jurors who convicted Mr. Diggs received the following instructions:

... [A]ny comments that I make about the facts, if I do make any comments about the facts, are not binding upon you and are advisory only. It is your duty to decide the facts and apply the law as I give it to you to those facts.

\* \* \*

During the trial I may have commented on the evidence or I may comment now, or I may have asked a question of a witness. Do not draw any inference or conclusions from my comments or my questions, either as to the merits of the case or as to my views regarding the witness or my views about the case.

In my opinion, the fact that the jury "hung" on the "possession with intent to distribute" charge reinforces the presumption that the jury followed those instructions. I would therefore affirm on the basis of this presumption even if the "partiality" issue had been preserved for appellate review. I would also reject the argument that we should apply the "repeated and egregious behavior" exception to the rule "that defense counsel must object in order to seek correction by the judge and preserve the issue for appeal."

It is clear that Mr. Diggs' trial counsel did not object to the questions asked by the Circuit Court during (1) Detective

Giganti's testimony, or (2) Sherienne Diggs' direct examination. It is anything but clear, however, "that continuous objections would have been futile and unprofessional and created more hostility and tension." The record shows that, after an objection was finally interposed during Ms. Diggs' cross-examination, the Circuit Court did not ask any more questions of that witness. The record also shows that Ms. Diggs, who insisted that she be permitted to "finish" her answers, was not intimidated in the least by the Circuit Court's questions.

I disagree with the conclusion that Mr. Diggs' trial counsel did not "adequately represent" her client. Whatever might be said about defense counsel, the record shows that she was not afraid to request appropriate relief on behalf of her client. In addition to engaging in a sharp exchange with the Circuit Court at the bench conference that occurred during Ms. Diggs' cross-examination, defense counsel made the following comments during closing argument:

> The judge in this particular case was unable to treat those people equally on the witness stand. In other words, when the officers were on the stand even the judge was like, oh, officer, you don't remember, that was so long ago. Very, you know, smoozey and polite to those particular witnesses, but when [Mr. Diggs and his sister] got on the stand it was . . . almost to the point of bullying. Those groups of people were treated differently and they weren't supposed to be. Why? Why did that happen? Well, he's a human being. Something in his past or the way he feels caused him to treat two different people differently. It's not supposed to be that way. Every person is supposed to be treated the same by the Court with the same dignity and respect. But it's a perfect example that even though we would like to believe that human beings don't let their hatred cause them to do wrong things, it does happen. It does happen and you saw it here during this trial.

In overruling the prosecutor's objection to that argument, the Circuit Court exhibited exceptional restraint. I would affirm the judgment of conviction on the ground that defense

counsel's "failure to object [to the questions about which Mr. Diggs now complains] was [nothing] more than a matter of trial tactics, which [should] afford no ground for reversal." *Woodell v. State*, 223 Md. 89, 97, 162 A.2d 468, 473 (1960).

### State v. Ramsey

Mr. Ramsey, who testified during the suppression hearing but did not testify at trial, conceded at sentencing that he had indeed been in possession of the drugs seized by Officer Torbit, but told the Circuit Court that he was a "user" who stole them from where they had been "stashed" by a "seller." During the sentencing proceeding, it is clear that the Circuit Court treated Mr. Ramsey with respect, and expressed sympathy for Mr. Ramsey's addiction. The majority, however, agrees with Mr. Ramsey's argument "that he was denied a fair trial as a result of judicial bias that began during a pre-trial suppression hearing, continued during voir dire and examination of witnesses and culminated during the course of instructing the jury."

Defense counsel's opening statement covers five pages of the trial transcript, two and one half pages of which were taken up by "the story of the Emperor's New Clothes." Defense counsel's closing argument covers six and one half pages, during which she argued that (1) Officer Torbit exhibited a "convenient memory," and (2) the Officer's testimony was not corroborated by any "video footage" from the police department's surveillance cameras that recorded activity at the locations where he claimed that he had observed Mr. Ramsey. At no point, however, did defense counsel argue that the State's evidence was consistent with the statement Mr. Ramsey made at sentencing.

The record shows that the Circuit Court would not permit Officer Torbit to give nonresponsive answers to defense counsel's questions. For example, the following transpired during Officer Torbit's cross-examination:

Q. Okay. Then finally you say that Mr. Ramsey had the bag prior to stopping him in the 1800 block of Pennsylvania?

A.   Exact, yes.

Q,   Okay.  And there are also cameras in the 1800–block of Pennsylvania, is that correct?

A.   Cameras don't cover everything.   They just cover certain parts of the block—

THE COURT:  Officer—

\* \* \*

THE COURT:  . . . Just answer her question.

THE WITNESS:  I'm sorry.

THE COURT:  The question was I think are there cameras in the 18—

THE WITNESS:  Yes.

THE COURT:  All right.   And the answer is yes.

[DEFENSE COUNSEL]:  The 1800–block of Pennsylvania?

\* \* \*

THE WITNESS:  Yes.

Taking action to prohibit a State's witness from giving non-responsive answers during cross-examination is the antithesis of hostility toward the defendant or defense counsel.

Rather than infer "hostility toward defense counsel" from the Circuit Court's decision to impanel the jury before holding the suppression hearing, we should compliment the Circuit Court for its efficiency.   The court's time is a valuable public commodity, and the only reasonable inference that can be drawn in this case is the inference that the Circuit Court wanted to have a jury ready to begin the trial at 9:30 a.m. on the following morning.

As to what occurred during jury selection, the Circuit Court did not "reseat" the juror whose "striking" the Circuit Court found to be "racially biased."   From my review of the record, that finding was not clearly erroneous, and the Circuit Court did not abuse its discretion in raising the *Batson* issue *sua sponte*.

Although Mr. Ramsey complains about what occurred during Officer Torbit's direct examination and Dr. Majid's redirect examination, the record shows that defense counsel did not object to any of the Court's questions. Defense counsel did, however, preserve for our review the issue of whether the Circuit Court erred or abused its discretion when it stated to the jury:

Ladies and gentlemen, most lawyers, good lawyers, talk to their witnesses.... Most lawyers talk to a witness before they put them on the stand.... It's perfectly appropriate for any lawyer to talk to any witness before they put them on the witness stand, and to review their testimony with them. It's absolutely appropriate.

In *State v. Earp*, 319 Md. 156, 571 A.2d 1227 (1990), this Court stated:

Attorneys have not only the right but also the duty to fully investigate the case and to interview persons who may be witnesses. A prudent attorney will, whenever possible, meet with the witnesses he or she intends to call.

*Id.* at 170, 571 A.2d at 1234. In *United States v. Rhynes*, 218 F.3d 310 (4th Cir.2000), the United States Court of Appeals for the Fourth Circuit stated:

Thorough preparation demands that an attorney interview and prepare witnesses before they testify. No competent lawyer would call a witness without appropriate and thorough pre-trial interviews and discussion. In fact, more than one lawyer has been punished, found ineffective, or even disbarred for incompetent representation that included failure to prepare or interview witnesses. *United States v. Tucker*, 716 F.2d 576 (9th Cir.1983) (defense counsel ineffective for failing to interview witnesses); *McQueen v. Swenson*, 498 F.2d 207 (8th Cir.1974) (same); *In re Warmington*, 212 Wis.2d 657, 668, 568 N.W.2d 641 (Wis.1997) (lawyer disbarred for, among other things, "failing to supervise the preparation of an expert witness"); *In re Wolfram*, 174

Ariz. 49, 847 P.2d 94, 96 (Ariz.1993) (failure to interview witnesses cited among reasons for suspending attorney). *Id.* at 319.

When the cross-examination of a witness insinuates that the witness' testimony was impermissibly influenced by the direct examiner, it is appropriate for the trial judge to instruct the jury about the lawyer's duty to meet with the witnesses who will be called to testify.[1] From my review of the record, I am persuaded that defense counsel's cross-examination of Officer Torbit "opened the door" to this instruction.

As to Mr. Ramsey's complaint about the "additional language" in the Circuit Court's "credibility" instruction, (1) everything added to MPJI Cr 3.10 is a correct statement of the law, and (2) on the basis of defense counsel's cross-examination of Officer Torbit, the decision to include the additional language did not constitute an unfairly prejudicial abuse of discretion.

For the reasons stated above, I would hold that Mr. Ramsey is not entitled to a new trial.

---

[1.] *See, e.g. 7th Cir PJI Modern Federal Jury Instructions—Criminal § 1.07,* which recommends that, if there has been testimony regarding prior interviews, the jury be instructed: "It is proper for an attorney to interview any witness in preparation for trial." This type of instruction has been "interpreted to be an attempt to offset the ancient trick in which an attorney questions a witness as to his interview with opposing counsel, often stated in a way to imply to the witness and jurors that this is an impropriety." *People v. Manley,* 222 Ill.App.3d 896, 165 Ill.Dec. 298, 584 N.E.2d 477, 490 (1990).