Emmanuel Ford Robinson v. State of Maryland, No. 11, September Term 2013.

**CRIMINAL PROCEDURE - JURY INSTRUCTIONS- SCIENTIFIC OR INVESTIGATIVE TECHNIQUES**

In light of *Atkins v. State*, 421 Md. 434, 26 A.3d 979 (2011) and *Stabb v. State*, 423 Md. 454, 31 A.3d 922 (2011) the Court of Appeals held that the trial judge erred, in giving an instruction that "there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case." In accordance with *Atkins* and *Stabb*, an "anti-CSI effect" instruction, to be given only in a curative fashion, shall not be entertained without legal and empirical proof that a "CSI effect" exists and is only triggered when a material misstatement of law occurs. The giving of the contested instruction, where the defense counsel merely pointed out what procedures might have been available to the State, but did not misstate the law or the State's burden, effectively relieved the State of its burden to prove the defendant's guilt beyond a reasonable doubt.

EMMANUEL FORD ROBINSON      *      In the

                                     *      Court of Appeals

     v.

                                     *      of Maryland

                                     *      No. 11

STATE OF MARYLAND            *      September Term, 2013

# O R D E R

The Court having considered the motion for reconsideration filed in the above-captioned case, it is this 27th day of January, 2014,

**ORDERED**, by the Court of Appeals of Maryland, a majority of the Court concurring, that the motion be, and it is hereby, granted, and it is further

**ORDERED**, that the opinion in this case filed on November 27, 2013 be, and it is hereby, recalled and a new opinion filed simultaneously with this order shall replace the opinion on November 27, 2013.

 

                                     /s/ Mary Ellen Barbera
                                        Chief Judge

IN THE COURT OF APPEALS OF

MARYLAND

No. 11

September Term, 2013

ON MOTION FOR RECONSIDERATION

---

EMMANUEL FORD ROBINSON

v.

STATE OF MARYLAND

---

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

---

Opinion by Battaglia, J.
McDonald, and Watts, JJ., dissent.

---

Filed: January 27, 2014

In the present case, we are asked to consider whether, in light of *Atkins v. State*, 421 Md. 434, 26 A.3d 979 (2011) and *Stabb v. State*, 423 Md. 454, 31 A.3d 922 (2011), a jury instruction in which the trial judge stated:

> During this trial, you've heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific tests. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether the defendant is guilty. *However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.* Your responsibility as jurors is to determine whether the State has proven based upon the evidence, the defendant's guilt beyond a reasonable doubt.

(emphasis added) constituted reversible error when a defense counsel remarked in opening statement:

> There will not be any fingerprints from any door, any piece of paper or tape, or whatever they're saying, on any weatherstripping, on the doors, no fingerprints of his. There won't be [the defendant's] DNA on anything, not on any screwdriver, not on any weatherstripping, not on any piece of tape, not on anything. Quite frankly, there's just not, there's absolutely no evidence beyond a reasonable doubt that Mr. Robinson committed these crimes.

In giving the contested instruction, the judge also noted, "what may actually have been off the record, which was our colloquy when we were preparing instructions, it's my understanding that the defense may be arguing, as good defense attorneys do, that there

wasn't any scientific link of the defendant to the crime."[1]

We granted certiorari, *Robinson v. State*, 430 Md. 11, 59 A.3d 506 (2013), to consider the following questions, which we have renumbered:[2]

> 1. Did the trial court abuse its discretion in providing to the jury, over objection, a "scientific or investigative techniques" instruction where defense counsel merely stated in opening statement that the lack of physical evidence demonstrated the absence of proof beyond a reasonable doubt, where defense counsel never mischaracterized the law, and where the trial court gave the instruction preemptively because defense counsel "may be arguing, as good defense attorneys do, that there wasn't any scientific link of the defendant to the crime"?
>
> 2. Where a co-defendant who entered a plea of guilty testified as a defense witness at Petitioner's trial two weeks later, did the trial court err in permitting the State, in the guise of cross-examination of the co-defendant, to effectively read into the record a statement of facts proffered at the co-defendant's guilty plea hearing but never adopted by the co-defendant?

We shall hold that the trial court erred in giving the jury the "scientific or investigative techniques"[3] instruction in this case.[4]

---

[1] Although the judge referred to a colloquy regarding proposed jury instructions with defense counsel, any transcription regarding the interaction, if there was one made, was not included in the record. There is no indication in the record regarding who suggested the inclusion of the contested instruction.

[2] Because of our disposition of the first question, we need not address the second.

[3] The "scientific or investigative techniques" jury instruction is also referred to as an "anti-CSI effect" or "no duty" jury instruction. *Stabb v. State*, 423 Md. 454, 456-57, 31 A.3d 922, 923 (2011). "The 'CSI effect' refers generally to various theories that assert that exposure to courtroom or criminal investigative fictional media may influence jurors' objective evaluation of an actual trial." *Id.* at 467, 31 A.3d at 930. The term "no duty" refers

(continued...)

2

(...continued)

to the instruction that there is "no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case." *Id.* at 456-57, 31 A.3d at 923.

[4] The State urges any error was harmless because the jury acquitted Robinson of second degree burglary and attempted second degree burglary and convicted Robinson of conspiracy to commit first degree burglary. The State argues, therefore, "the presence or absence of forensic evidence in no way could have influenced the jury's verdict." Essentially, the State asserts that the conviction for conspiracy did not implicate proof of the presence of forensic evidence and so the "anti-CSI" instruction was mere surplusage.

We have had occasion to review whether an error was harmless, when a jury instruction was invoked, and have opined:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.

> In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury . . . to determine." " 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt.' " " 'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' " The "harmless error rule . . . has been and should be carefully circumscribed." Harmless error review is the standard of review most favorable to the defendant short of an automatic reversal.

(continued...)

3

In the present case, Emmanuel Ford Robinson, Petitioner, was charged in a six count

indictment[5] with various crimes related to events that occurred in Montgomery County,

---

(...continued)

*Tucker v. State*, 407 Md. 368, 383, 965 A.2d 900, 908-09 (2009), quoting *Bellamy v. State*, 403 Md. 308, 332-33, 941 A.2d 1107, 1121 (2008), quoting in turn *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976) (ellipses in original). In *Tucker*, we determined that a cross-racial identification instruction given in error could not be deemed harmless because the instruction addressed testimony critical to the case, which was "tainted by the discounting of any potentially adverse effect of cross-racial bias in the erroneous instruction." *Id.* at 383, 965 A.2d at 909.

In the instant case, the instruction had not been generated by the defense attorney, so the trial judge erred in giving the instruction. That the error was not harmless was compounded by the fact that the physical evidence to which it applied, the only evidence provided other than testimony, was so critical to the case.

[5] The indictment contained six charges:

> COUNT ONE: <u>ATTEMPTED SECOND DEGREE BURGLARY</u>
>     The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **ROLAND D SPENCE** and **EMMA[N]UEL FORD ROBINSON**, on or about February 28, 2011, in Montgomery County, Maryland, did attempt to break and enter the storehouse of Avalon at Grosvenor Station Apartments, located at 10306 Strathmore Hall Street, North Bethesda, Maryland, with intent to commit theft, in violation of the Common Law against the peace, government, and dignity of the State.
>
> COUNT TWO: <u>CONSPIRACY TO COMMIT SECOND DEGREE BURGLARY</u>
>     The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **ROLAND D SPENCE** and **EMMA[N]UEL**

(continued...)

4

(...continued)

**FORD ROBINSON**, on or about February 28, 2011, in Montgomery County, Maryland, did conspire to commit second degree burglary, in violation of the Common Law against the peace, government, and dignity of the State.

COUNT THREE: <u>SECOND DEGREE BURGLARY</u>

The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **ROLAND D SPENCE** and **EMMA[N]UEL FORD ROBINSON**, on or about February 28, 2011, in Montgomery County, Maryland, did break and enter the storehouse of Inigo's Crossing Apartments, located at 5405 Tuckerman Lane, North Bethesda, Maryland, with intent to commit theft, in violation of Section 6-203(a) of the Criminal Law Article against the peace, government, and dignity of the State.

COUNT FOUR: <u>CONSPIRACY TO COMMIT SECOND DEGREE BURGLARY</u>

The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **ROLAND D SPENCE** and **EMMA[N]UEL FORD ROBINSON**, on or about February 28, 2011, in Montgomery County, Maryland, did conspire to commit second degree burglary, in violation of the Common Law against the peace, government, and dignity of the State.

COUNT FIVE: <u>ATTEMPTED FIRST DEGREE BURGLARY</u>

The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **ROLAND D SPENCE** and **EMMA[N]UEL FORD ROBINSON**, on or about February 28, 2011, in Montgomery County, Maryland, did attempt to attempt to break and enter the dwelling house of Robert Eshan, located at 5405 Tuckerman Lane, Apartment 556, North Bethesda, Maryland, with the intent to commit theft in violation of the Common Law

(continued...)

Maryland, on February 28, 2011. He was eventually convicted of conspiracy to commit first degree burglary.[6]

The State's theory of the case was that Robinson "tried to break into one apartment building with another young man by the name of Roland Spence [and] was unsuccessful. He then went across Route 355[7] and [broke] into a second [building] . . . and then he tried to

---

(...continued)

> against the peace, government, and dignity of the State.
>
> COUNT SIX: <u>CONSPIRACY TO COMMIT FIRST DEGREE BURGLARY</u>
> The Grand Jurors of the State of Maryland, for the body of Montgomery County, upon their oaths and affirmations, present that **ROLAND D SPENCE** and **EMMA[N]UEL FORD ROBINSON**, on or about February 28, 2011, in Montgomery County, Maryland, did conspire to commit first degree burglary, in violation of the Common Law against the peace, government, and dignity of the State.

[6] After the State presented its case, the judge took under advisement Robinson's motion for acquittal of Counts Two, Four, and Five. The judge, thereafter, granted Robinson's motion for acquittal with respect to Count Four, concluding that "in view of the fact that there are two separate charges of conspiracy to commit a second degree burglary and that the defendant did request a bill of particulars which the State chose not to answer or said didn't apply here, leads me to conclude that the State shouldn't have the benefits of two conspiracies. I do believe it's thereby duplicitous to charge it two different times." The judge granted defense counsel's motion for judgment of acquittal of Count Five, determining that, "it simply doesn't charge an offense because there's no crime called an attempt to attempt" and could not be amended because it was a "non-offense." The judge denied the motion as to Count Two. Ultimately, Count Six, conspiracy to commit first degree burglary, became Count Four.

[7] Maryland Route 355 (Wisconsin Avenue) is the main commercial corridor that runs from North to South through Bethesda, Maryland. *See* Montgomery County Department of Transportation, *available at* http://www.montgomerycountymd.gov/dot-tmc/cam.html#routes

(continued...)

break into an apartment in that building." During his opening statement, Robinson's attorney asserted that there was no evidence of wrongdoing by his client:

> [T]his is a case about speculation. You're not going to hear any witness come in and say that they saw Emmanuel Robinson attempt to pry open any door, attempt to break and enter anywhere, or break and enter into anything. . . .

> \*      \*      \*

> The evidence in this case, you'll find, is so inconsistent and so unreliable that without guessing or filling in holes, speculating – which you cannot do, and His Honor will tell you that later – you will more than likely have many more questions than answers as to what really happened on February 28th. You will have very reasonable doubts and many of them, and it only takes one. What we expect the evidence in this case to show is that Mr. Robinson is not guilty of any of the charges, that there is no evidence to show that he pried open or broke into any door.

> There is no evidence that he ever attempted to pry open or break into any door. There will be no evidence to show that he ever had a screwdriver on him or any kind of tool like that. There will not be any fingerprints from any door, any piece of paper or tape, or whatever they're saying, on any weatherstripping, on the doors, no fingerprints of his. There won't be his DNA on anything, not on any screwdriver, not on any weatherstripping, not on any piece of tape, not on anything. *Quite frankly, there's just not, there's absolutely no evidence beyond a reasonable doubt that Mr. Robinson committed these crimes.*

> Another thing is that we expect the evidence will show that there will be no witness who will be able to come in and tell you that they saw Mr. Robinson attempt to get into any of these, into any of these doors; that he was the one doing anything. The

(...continued)
(last visited Nov. 25, 2013).

7

> best they'll be able to say is they believe that was Mr. Robinson who was present. And His Honor will instruct you later about mere presence at the scene of a situation where somebody may be committing a crime.

(emphasis added). Testimony of two police officers, called to the stand by the State, put Spence at the scene of the crime and Robinson in the area, leaving with Spence, after which they both were detained by the police. Defense counsel cross-examined the surveillance team officers[8] called by the State whether casting for tool mark impressions had been accomplished or fingerprint and DNA testing requested, as well as questioned a Montgomery County Police Department forensic specialist[9] as to whether casting for tool mark impressions had been performed, to which she responded in the negative. No rebuttal testimony was offered by the State before jury instructions were entertained, although, apparently, there was discussion that had occurred among the judge and counsel regarding the proposed jury instructions.

At the close of all of the evidence but before argument, the judge instructed the jury:

> During this trial, you've heard testimony of witnesses and

---

[8]  Robinson's counsel questioned two officers from the surveillance team: an investigating officer who responded to the crime scene and an officer who arrested Robinson and Spence. The investigating officer was questioned whether the door of the apartment had been tested for fingerprints or DNA and whether casting was done on the door for tool mark impressions. The officer who arrested Robinson was questioned as to whether the screwdriver recovered from Spence was compared to pry marks at the door.

[9] The forensic specialist testified as to her role as: "My job is to respond to all crime scenes in Montgomery County. I document the scenes with photographs. Sometimes we use videos or sketches. I have to identify, package, process, and transport evidence from the scenes."

8

may hear argument of counsel that the State did not utilize a specific investigative technique or scientific tests. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether the defendant is guilty. *However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.* Your responsibility as jurors is to determine whether the State has proven based upon the evidence, the defendant's guilt beyond a reasonable doubt.

(emphasis added). Defense counsel objected to the specific instruction in a bench conference following the giving of all the instructions:

And as to the non-pattern instruction as to police investigative techniques, I object to that instruction being given. I don't believe that the evidence in the case has warranted that such an instruction be given and other than a standard argument given with regard to the absence of evidence to convict my client, I don't believe that there's any other justification for giving that instruction in this case.

The court replied:

All right, well, based upon the opening statement in which it was suggested that there wasn't any fingerprint or DNA evidence, and then what may actually have been off the record, which was our colloquy when we were preparing instructions, it's my understanding that the defense may be arguing, as good defense attorneys do, that there wasn't any scientific link of the defendant to the crime. So I think it's generated by the proffered arguments here and I'll note your objection and overrule it.

In closing, defense counsel, in fact, argued:

And we would submit that the testing that's been done in this case and what was done in this case and quite frankly, just some of the examples of the carelessness in the investigation

9

and just how loose the investigators were with the facts in this case and the conclusions that they jumped to in this case would suggest to you that the State has not proven its case beyond a reasonable doubt here.

There has been no evidence presented in this case that Mr. Robinson pried open or broke in a door, that he ever attempted to pry in or break into any door, that he ever had any screwdriver or tool on him, that his fingerprints are on any door, screwdriver, tape, weatherstripping or anything, that his DNA was on any of those items. There's just absolutely no evidence in this case beyond a reasonable doubt that Emmanuel Robinson committed these crimes.

After the jury found only Robinson guilty of conspiracy to commit first degree burglary, the judge imposed a sentence of ten years' incarceration, with all but four years suspended, followed by two years' probation.

Robinson noted a timely appeal to the Court of Special Appeals,[10] which affirmed the conviction in an unreported opinion, determining:

---

[10] Robinson presented the following three questions to the Court of Special Appeals for review:

1. Did the trial court err by offering, over objection, an "investigative or scientific techniques" jury instruction?

2. Did the trial court err in admitting facts proffered by the State at [a defense witness]'s recent plea hearing that implicated [appellant] in the burglaries and in allowing the State to question [the witness] about those facts?

3. Did the trial court abuse its discretion by giving a missing witness jury instruction, over defense objection?

(alterations in original).

10

[defense counsel] was entitled to – and did – point out what procedures were available to investigators, he went beyond that and attributed an incorrect burden to the State, which required correction by the court . . . [and] while the instruction was not given in conjunction with an explanation of the State's burden to prove guilt beyond a reasonable doubt, the instruction correctly stated that proof beyond a reasonable doubt does not require a specific investigative technique or scientific evidence.

We, then, granted certiorari.

In this case, we take the opportunity to more fully elucidate the *Atkins* and *Stabb* standards that an "anti-CSI effect" instruction, limited only to curative administration, shall not be entertained without legal and empirical proof that a "CSI effect" exists and is only triggered when a material misstatement of the law occurs. We determine that the trial court erred in the instant case by giving the contested instruction.

It is important to place the case *sub judice* in the context of the development of the theory of the "CSI effect"[11] and its treatment by us and the Court of Special Appeals since 2002. The term "CSI effect" arose in 2002,[12] in response to the increased popularity of

_____

[11] The "CSI effect" refers to a theorized link between television crime scene dramas and an expectation by jurors for forensic or scientific evidence, such as DNA, in most criminal cases. Judge Donald E. Shelton, *Juror Expectations for Scientific Evidence in Criminal Cases: Perceptions and Reality About the "CSI Effect" Myth*, 27 T.M. Cooley L. Rev. 1, 3 (2010) ("As these shows proliferated, prosecutors complained that all of the television fiction about forensic-science evidence made jurors expect too much of the government and that juries were *wrongfully* acquitting defendants when the prosecution did not present the kind of evidence that they saw on *CSI*; the news media picked up on these complaints, accepted them as factual, and quickly labeled it the 'CSI Effect.'").

[12] Jeffrey Kluger, *How Science Solves Crimes,* Time, Oct. 21, 2002; Robin Franzen, *TV's "CSI" Crime Drama Makes It Look Too Easy*, The Oregonian, Dec. 10, 2002, *available*
(continued...)

11

forensic crime television shows and complaints that these shows were heightening juror

expectations that forensic evidence, like DNA, would be admitted in criminal trials. *See*

Jenny Wise, *Providing the* CSI *Treatment: Criminal Justice Practitioners and the CSI Effect*,

21 Current Issues Crim. Just. 383, 383-84 (2010); Simon A. Cole & Rachel Dioso-Villa,

*Investigating the '*CSI *Effect' Effect: Media and Litigation Crisis in Criminal Law*, 61 Stan.

L. Rev. 1335, 1338-39 (2009). A 2005 survey[13] of 102 prosecutors in Maricopa County,

Arizona, found that an overwhelming majority felt that jurors "expected to be presented with

scientific evidence." Andrew P. Thomas, *The* CSI *Effect: Fact or Fiction*, 115 Yale L. J.

Pocket Part 70, 71 (2006), http://www.yalelawjournal.org/images/pdfs/32.pdf. In a 2006

survey,[14] 1,027 prospective jurors were questioned regarding their television watching habits,

pre-trial expectations of types of evidence to be provided, and the likelihood that different

(...continued)
*at* 2002 WLNR 13048250.

[13]  Maricopa County Attorney's Office, *CSI: Maricopa County: The CSI Effect and its Real-Life Impact on Justice*, A Study by the Maricopa County Attorney's Office at 5, http://www.ce9.uscourts.gov/jc2008/references/csi/CSI_Effect_report.pdf (2005) (noting that thirty-eight percent of prosecutors surveyed "believed they had at least one trial which resulted in either an acquittal or hung jury because forensic evidence was not available").

[14]  The survey was conducted by Judge Donald E. Shelton, Chief Judge for the Twenty-Second Circuit Court of Michigan and faculty member of Eastern Michigan University, Young S. Kim, Assistant Professor of Criminology at Eastern Michigan University, and Gregg Barak, Professor of Criminology & Criminal Justice at Eastern Michigan University. The questionnaire was administered to 1,027 jurors "prior to any jurors being dispatched to courtrooms for selection in any type of case [and the] group was advised by the presiding judge that the information on the surveys was for academic and research purposes only and that it would have no bearing on whether they were selected for jury duty in any case." Shelton, *supra*, at 343.

types of evidence would affect their reasonable doubt determination; the author concluded that "[w]hile the study did find significant expectations and demands for scientific evidence, there was little or no indication of a link between those inclinations and watching particular television shows." Judge Donald E. Shelton et al., *A Study of Juror Expectations and Demands Concerning Scientific Evidence: Does the "CSI Effect" Exist?*, 9 Vand. J. Ent. & Tech. L. 331, 333 (2006). That same year a Fordham law journal report, concluded that, based on a survey of 306 jury eligible graduate and undergraduate students, who responded to questions regarding their television viewing habits and a mock criminal law scenario, the so-called "CSI effect" did not affect jury verdicts.[15] Kimberlianne Podlas, *"The CSI Effect": Exposing the Media Myth*, 16 Fordham Intell. Prop. Media & Ent. L.J. 429 (2006). A survey conducted at Arizona State University of forty-eight jury eligible university students, suggested that viewing "CSI-type" programs might have affected jurors' expectations for forensic evidence but likely did not affect verdicts, based on the students' responses to forensic evidence presented in a simulated transcript of a criminal trial.[16] N.J. Schweitzer

---

[15] The survey identified participants as "CSI viewers" or "non-CSI viewers" and provided participants with a crime scene scenario, asking them to elect "guilty" or "not guilty" and chose from eight possible factors that contributed to their verdict determination. Four of the eight factors were deemed "CSI marked" factors, to see if there was a correlation between CSI viewing and reliance on "CSI marked" factors. Podlas, *supra,* at 455-60.

[16] The survey was conducted by a Ph.D. candidate in the Department of Psychology, N.J. Schweitzer, at Arizona State University, and Michael J. Saks, a Professor of Law and Psychology and Faculty Fellow at the Center for the Study of Law, Science, and Technology, Sandra Day O'Connor College of Law, Arizona State University, for publication in the Sandra Day O'Connor College of Law journal, *Jurimetrics: The Journal of Law, Science,*

(continued...)

& Michael J. Saks, *The* CSI *Effect: Popular Fiction About Forensic Science Affects the Public's Expectations About Real Forensic Science*, 47 Jurimetrics 357 (2007). Results, thus, remained inconclusive as to the existence of a "CSI effect" and largely suggested that while jurors seem to have increased expectations regarding admission of forensic evidence, it had not been shown that these expectations were the result of viewing CSI type programs or that watching CSI type programs affected a juror's likelihood to acquit or convict.

In 2007, the Court of Special Appeals was called upon to address whether giving an "anti-CSI effect" instruction was error in *Evans v. State*, 174 Md. App. 549, 922 A.2d 620, *cert. denied*, 400 Md. 648, 929 A.2d 890 (2007).[17] Evans was charged with possession and distribution of heroin as a result of an undercover "buy-bust." *Id.* at 553, 922 A.2d at 623. At trial, Evans's counsel cross-examined the detectives as to specific investigative techniques that were not used and argued that without video or audio surveillance tapes, "cross-checks

---

(...continued)
*and Technology*.

[17] In *Evans*, the court considered:

> 1. Whether the trial court erred in failing to suppress evidence illegally obtained from appellant in a search incident to an arrest made without probable cause[.]
>
> 2. Whether the trial court erred in instructing the jury on the State's failure to use certain investigative and scientific techniques, where the instruction hampered appellant's ability to present his legal defense and was not part of the Maryland Pattern Criminal Instructions[.]

*Evans*, 174 Md. App. at 553, 922 A.2d at 622 (alterations in original).

14

of reliability," there was "no other real ways to prove [what occurred] because the arrest team, the lack of any video surveillance evidence, whatever, none of that, absolutely none of that exists in this case."[18]  *Id.* at 563, 922 A.2d at 628.  Evans's co-defendant further argued, "[y]ou have a situation where there are absolutely no scientific tests that implicate my client in any way.  There's no audio.  There's no video.  There's no fingerprints.  There is nothing."  *Id.* at 564, 922 A.2d at 629.  The judge issued, upon the State's request, an identical instruction to the one at issue in the present case.[19]  *Id.* at 562, 922 A.2d at 628.

---

[18]  Evans's counsel argued:

> There are very significant facts in this case that create reasonable doubt that my client and [Peaks' Counsel] client were acting in a conspiracy, in concert to distribute drugs.  Now, one factor in this case is whether or not there are any cross-checks of reliability.  Cross-checks of reliability means that apart from the testimony of one officer who is telling you what he claims happened, are there any other cross-checks of reliability?  Well, we know in this case that there is no video of this event, no surveillance tapes of this event.  There were questions asked of the detective whether that may have been a possibility, could have broken out a video camera, worn an audio, was it available.  I think that could have been done.  It wasn't done here.  That would have been a cross-check of reliability so that besides the testimony of the detective, you would have something else to cross-check.

*Evans*, 174 Md. App. at 563, 922 A.2d at 628 (alterations in the original).

[19]  The judge instructed:

> During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific test.  You may consider

(continued...)

15

Evans challenged the instruction in the Court of Special Appeals; the intermediate appellate court determined that giving the instruction was not an abuse of discretion, because of the "robust and vehement" arguments of counsel that guilt could not be proven without scientific or investigative evidence. *Id.* at 570-71, 922 A.2d at 632-33.

Four years after *Evans* issued, we heard oral argument in *Atkins v. State*, 421 Md. 434, 26 A.3d 979, on April 7, 2011, after which, within four months, the instruction was given in the present case. Less than one month after the instant trial concluded, we issued our opinion in *Atkins*, setting forth our standard for evaluating the giving of an "anti-CSI effect" instruction. In the case, Atkins had been convicted by a jury of three counts of second degree assault. The State's theory of the case had been that Atkins attacked three others in a physical altercation, during which Atkins reached into his pocket, according to a witness, after which the victim suffered a serious injury from a stab wound. The State argued at trial that a 12-inch knife recovered by police from a search of Atkins's home was the weapon used in the commission of the crime. Atkins had claimed he used a smaller folding pocket

(...continued)

> these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether a defendant is guilty. *However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.* Your responsibility as jurors is to determine whether the State has proven, based on the evidence, the defendants' guilt beyond a reasonable doubt.

*Id.* at 562, 922 A.2d at 628 (emphasis added).

16

knife, in self-defense during the attack, rather than the larger knife introduced by the State.

During trial, Atkins's counsel cross-examined the officers regarding whether forensic testing had been done on the 12-inch knife. The State, in response, requested an instruction identical to the instruction given in the present case, which issued.[20] Atkins appealed to the Court of Special Appeals, arguing that the giving of the instruction was an abuse of discretion by the trial judge. The intermediate appellate court, in an unreported opinion, relying on *Evans*, determined that in light of cross-examination by Atkins's counsel, the instruction was appropriate, "a correct statement of the law, applicable to the facts, and not fairly covered by the other instructions given."

We granted certiorari to determine: "Whether an instruction that the State need not use certain investigative and scientific techniques violated the Sixth and Fourteenth Amendments and the Maryland Declaration of Rights by undermining the defense's legitimate strategy and

---

[20] The trial judge instructed:

> During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific test. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether the defendant is guilty. *However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.* Your responsibility as jurors is to determine whether the State has proven based upon the evidence the defendant's guilt beyond a reasonable doubt.

*Atkins*, 421 Md. at 441-42, 26 A.3d at 982-83 (emphasis added).

17

bolstering the State's case?" *Atkins*, 421 Md. at 437, 26 A.3d at 980. We answered that the judge abused her discretion when she gave the contested "anti-CSI effect" instruction, "because it resulted in a non-neutral commentary on the evidence, or the absence of evidence, actually admitted, and invaded the province of the jury, thus violating Atkins's constitutional rights to due process and a fair trial." *Id.* at 437, 26 A.3d at 980. We distinguished the Court of Special Appeals's opinion in *Evans,* because, in *Atkins,* scientific testing concerned a critical piece of physical evidence, the weapon used in the assault, while in *Evans* the failure of the State to provide forensic testing was not a crucial issue in the case. Additionally, we noted, unlike *Evans*, that Atkins did not argue lack of evidence in closing and only briefly cross-examined the police officer regarding lack of testing.

Within three months our opinion in *Stabb* issued, to "provide additional guidance to Bench and Bar when confronted with requests (usually from the State) for this (or a similar) type of jury instruction seeking to avert the purported 'CSI effect.'" 423 Md. at 457, 31 A.3d at 923. Stabb had been charged with third-degree sexual assault and second-degree assault of a minor. During trial, the child testified that Stabb touched her inappropriately; the officer, who responded to the complaint, testified that he referred the minor and her mother to a social worker but did not refer the minor for medical treatment, because vaginal penetration had not been alleged. Stabb questioned the social worker during trial as to whether she had referred the minor for medical testing for evidence of a sexual assault, which had not occurred, because the victim had bathed and changed clothes by the time she was

18

evaluated by the social worker.

At the end of the case, the judge gave the same instruction given in *Evans*, *Atkins*, and in the instant case, based upon Stabb's cross-examination and in anticipation of closing argument, after which Stabb was convicted. After the Court of Special Appeals affirmed, we granted certiorari to consider: "Did the trial court err in instructing the jury that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case?" *Id.* at 462, 31 A.3d at 927.

Based on *Atkins*, we concluded in *Stabb* that the giving of an "anti-CSI effect" instruction was error and that the existence of a "CSI effect" had not been empirically or legally established. We noted, rather, that "CSI" studies performed on mock jurors and potential jurors reported inconsistent results and were inconclusive.[21] Further, we determined that the giving of the instruction in *Stabb* was error, because Stabb had "argued properly and without undue emphasis the lack of corroborating physical evidence of the crime" and permissibly alluded to the absence of corroborating physical evidence but did not imply that the "missing evidence" would favor the defense, *id.* at 471-72, 31 A.3d at 932; thus, giving

---

[21] The primary consistency among researchers' conclusions was the opinion that more research was needed. *See Stabb,* 423 Md. at 468-69, 31 A.3d at 930, citing Lindy A. Orthia, et at., *How Do People Think About the Science They Encounter in Fiction? Undergraduates investigate responses to science in The Simpsons*, Int'l J. Of Sci. Educ., Part B., Abstract, *available at* http://www.tandfonline.com/doi/abs/10.1080/21548455.2011.610134; Dante E. Mancini, *The CSI effect reconsidered: is it moderated by the need for cognition?*, N. Am. J. Psychol. (Mar. 2011); Amber L. Ferris, *Examining the "CSI Effect": The Impact of Crime Drama Viewership on Perceptions of Forensics and Science* (Aug. 2011) (unpublished Ph.D. dissertation, Kent State University.)

19

the instruction had improperly relieved the State of its burden and invaded the province of the jury. We concluded that due to the lack of legal and empirical evidence that a "CSI effect" existed, and because the giving of the instruction is "fraught with the potential for reversible error," if such an instruction is requested, and is appropriate, its use should be confined to curative situations. *Id.* at 473, 31 A.3d at 933.

Essentially, *Atkins* and *Stabb* counsel that in light of "the currently inconclusive state of the scholarly legal and/or scientific communities' research, taken as a whole, regarding whether such a phenomenon as the 'CSI effect' exists," the instruction should not be given preemptively and should be "confined to situations where it responds to correction of a pre-existing overreaching by the defense, i.e., a curative instruction." *Stabb*, 423 Md. at 472-73, 31 A.3d at 933. In particular, neither cross-examination regarding whether scientific testing had been done, nor, counsel's arguments regarding lack of scientific evidence generated giving the contested instruction; the instruction, instead, in fact relieved the State of its burden to prove the case beyond a reasonable doubt.

In *Stabb*, we suggested the appropriateness of the "anti-CSI effect" instruction only "where it can be demonstrated by appropriate scholarly research that a 'CSI effect' has been found to exist by the relevant legal and/or scientific communities and its scope and effect can be relied upon to tailor an appropriate response through voir dire questions and/or jury instructions." 423 Md. at 473, 31 A.3d at 933. In the last two years since we issued our opinion in *Stabb*, legal and empirical proof of the existence of a "CSI effect" is still

20

wanting.[22]   An article published by the American Bar Association in *Insights on Law &*

*Society* in the Fall of 2011 by an Associate Professor of Media Studies at the University of

North Carolina at Greensboro described the "CSI effect" as "more myth than reality" because

"[s]cholars from law and other fields have been unable to find any empirical support for an

antiprosecution 'CSI effect' on verdicts."  Kimberlianne Podlas, *The Verdict on Television:*

*How Does Television Inform Our Understanding of the Legal System?*, 12 Insights on L. &

Soc'y 16, 19 (2011).[23]   In a 2012 article in the *University of Virginia School of Law Sports*

*& Entertainment Law Journal* by Caroline Kinsey, a Professor and Public Interest Fellow at

the University of Michigan College of Law, suggesting how prosecutors and attorneys might

adjust their practices to accommodate heightened expectations by jurors, noted that the

---

[22]  Two reports published shortly before our opinions issued in *Atkins* and *Stabb*, not referenced in either opinion, described additional surveys: one report published in the *Thomas M. Cooley Law Review* in 2010, concluded, based on a questionnaire given to 2,246 jurors prior to jury selection, jurors gave the most weight to eye-witness testimony, and with the exception of rape cases, were no more likely to acquit defendants without scientific evidence.  Judge Donald E. Shelton, *Juror Expectations for Scientific Evidence in Criminal Cases: Perceptions and Reality About the "CSI Effect" Myth*, 27 T.M. Cooley L. Rev. 1 (2010).  Another 2010 report, published by professors from California State University, Los Angeles, based on a telephone survey of 1,201 California registered voters regarding their television viewing habits and the weight of reliability they would place on different types of evidence, determined that even presuming CSI viewers might have a predisposition to acquit or convict based on scientific evidence, due to the large number of variables that can affect a juror's verdict, such as age, gender, race, or dislike of an attorney or witness, it was not possible to determine whether CSI watching affected the outcome of cases.  Deborah R. Baskin and Ira B. Sommers, *Crime-Show-Viewing Habits and Public Attitudes Toward Forensic Evidence: The "CSI Effect" Revisited*, 31 Just. Sys. J. 97 (2010).

[23]  *See also* Mark A. Godsey & Marie Alou, *She Blinded Me With Science: Wrongful Convictions and the "Reverse CSI-Effect,"* 17 Tex. Wesleyan L. Rev. 481, 483 (2011) (noting that "prosecutorial claims of the CSI Effect have not been empirically verified").

21

validity of the "CSI effect" had not been established.  Caroline L. Kinsey, *CSI: From the Television to the Courtroom*, 11 Va. Sports & Ent. L. J. 313, 314 (2012).  In a 2013 monograph on forensic science in American popular culture, Lindsey Steenberg, Professor of Film Studies at Oxford Brookes University, stated that there remains no definitive proof that viewing CSI type television shows directly affects a juror's likelihood to acquit or convict, and "the panic about one specific television show stems from a small number of sources and experts, rather than wide-ranging research or investigation."  Lindsay Steenberg, Forensic Science in Contemporary American Popular Culture: Gender, Crime, and Science 104 (Routledge Taylor & Francis Group 2013).  The academic and scientific community has yet to conclude that a "CSI effect" exists and, thus, supports our skeptical view that the "CSI effect" exists.[24]

In the face of our avowed skepticism regarding the appropriate use of an "anti-CSI effect" instruction, the State argues that the instruction in the present case was an appropriate exercise of the trial judge's discretion, because of Robinson's counsel's remarks in opening statement, as well as the off the record instruction colloquy, and his cross-examination of witnesses.  We iterate that the "anti-CSI effect" instruction should not be given preemptively, as was suggested in the instant case by the judge when he addressed possible closing argument by defense counsel.

---

[24]  Our approach to the "CSI effect" is consistent with the Massachusetts Supreme Court in *Commonwealth v. Gray*, 990 N.E.2d 528 (Mass. 2013) and *Commonwealth v. Perez*, 954 N.E.2d 1 (Mass. 2011).

22

While it is true that Robinson's counsel opened by saying, in part, "[t]here will not be any fingerprints from any door . . . [t]here won't be his DNA on anything, not on any screwdriver, not on any weatherstripping, not on any piece of tape, not on anything. Quite frankly, there's just not, there's absolutely no evidence beyond a reasonable doubt that Mr. Robinson committed these crimes," a mere reference to the lack of evidence does not trigger giving an "anti-CSI effect" instruction. We have reflected, for example, when reference has been made by defense counsel to the lack of fingerprint evidence, that, "when the State has failed to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity, the defendant ought to be able to comment on the absence of such evidence." *Sample v. State*, 314 Md. 202, 207, 550 A.2d 661, 663 (1988) citing *Eley v. State*, 288 Md. 548, 553, 419 A.2d 384, 386 (1980); *see Patterson v. State*, 356 Md. 677, 683, 741 A.2d 1119, 1122 (1999) ("The law of Maryland concerning nonproduction of evidence is well-established: An inference may be made against the State."). Certainly, lack of evidence is a common defense in a criminal case to generate reasonable doubt just as in the instant case.

Robinson's counsel's opening statement and cross-examination merely pointed out what procedures might have been available to the State, but did not misstate the law or the State's burden. Robinson's counsel cross-examined the officers regarding whether testing had been ordered to compare the screwdrivers recovered to pry marks on the door to the apartment and whether fingerprint or DNA tests had been ordered, but did not insinuate that

23

the State had any obligation to perform such testing or that had tests been performed, the results of such testing would have favored his client.

As a result, we hold that the trial judge erred in giving the "anti-CSI effect" instruction which effectively relieved the State of its burden to prove Robinson guilty beyond a reasonable doubt.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF CONVICTION AND REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

Circuit Court for Montgomery County
Criminal Case No. 118113

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2013
———————————————————————

EMMANUEL FORD ROBINSON

v.

STATE OF MARYLAND
———————————————————————

Barbera, C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.
———————————————————————

Dissenting Opinion by Watts, J., which
McDonald, J., joins
———————————————————————

Filed: January 27, 2013

Respectfully, I dissent.

I would hold that the Circuit Court for Montgomery County ("the circuit court") did not abuse its discretion in giving the anti-CSI effect jury instruction. During the opening statement of Emmanuel Ford Robinson ("Robinson"), Petitioner, Robinson's counsel stated:

> **There will not be any fingerprints** from any door, any piece of paper or tape, or whatever they're saying, on any weatherstripping, on the doors, no fingerprints of his. **There won't be his DNA** on anything, not on any screwdriver, not on any weatherstripping, not on any piece of tape, not on anything. Quite frankly, there's just not, **there's absolutely no evidence beyond a reasonable doubt** that [] Robinson committed these crimes.

(Emphasis added). In so stating, Robinson's counsel essentially represented that, without scientific evidence (*i.e.*, fingerprints and DNA), there was "**absolutely no** evidence beyond a reasonable doubt[.]" (Emphasis added). In other words, Robinson's counsel: (1) equated a lack of scientific evidence with a lack of proof beyond a reasonable doubt; and (2) implied that the State was required to offer scientific evidence to satisfy the State's burden of proof beyond a reasonable doubt. Thus, Robinson's counsel misstated the State's burden of proof. As a result, the circuit court accurately and properly instructed the jury that "there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case."[1] A trial court does not abuse its discretion in giving an anti-CSI effect jury instruction after a defendant misstates the

---

[1]Any conclusion that the challenged instruction in this case "effectively relieved the State of its burden to prove Robinson guilty beyond a reasonable doubt[,]" Majority Slip Op. at 24, is contradicted by the text of the instruction itself, which concluded with the statement that "[y]our responsibility as jurors is to determine whether the State has proven based upon the evidence, the defendant's guilt beyond a reasonable doubt."

State's burden. See generally Atkins v. State, 421 Md. 434, 451, 26 A.3d 979, 988 (2011) ("[C]ounsel . . . did not incorrectly state the law or the State's burden. . . . There was an insufficient basis . . . generating a need for a curative or cautionary jury instruction clarifying the State's burden in regards to specific investigative techniques."); Stabb v. State, 423 Md. 454, 473, 31 A.3d 922, 933 (2011) (This Court stated that an anti-CSI effect jury instruction "ought to be confined to situations where it responds to correction of a pre-existing overreaching by the defense, i.e., a curative instruction.").

It is entirely consistent with this Court's holdings in Atkins and Stabb to conclude that, here, the circuit court did not abuse its discretion in giving the anti-CSI effect jury instruction. In both Atkins and Stabb, this Court expressly declined to hold that a trial court automatically abuses its discretion in giving an anti-CSI effect jury instruction. See Atkins, 421 Md. at 438, 26 A.3d at 980 ("[W]e do not hold that an investigative or scientific techniques instruction would be improper under different circumstances[.]"); Stabb, 423 Md. at 457, 31 A.3d at 923 ("'[A]nti-CSI effect' or 'no duty' instructions are not per se improper necessarily[.]"). In fact, in both Atkins and Stabb, this Court confined its holding to the particular facts of each case. See Atkins, 421 Md. at 437-38, 26 A.3d at 980 ("This conclusion . . . is based on the particular facts in this case[.]"); Stabb, 423 Md. at 463, 31 A.3d at 927 ("[U]nder the facts of this case, the trial court abused its discretion[.]"). As discussed above, the standard that this Court ultimately enunciated in Stabb, id. at 473, 31 A.3d at 933–that an anti-CSI effect jury instruction is warranted "where it responds to correction of a pre-existing overreaching by the defense, i.e., a curative instruction"–applies here, where Robinson's counsel implied that the State

was required to offer scientific evidence to satisfy the State's burden of proof beyond a reasonable doubt.

Both Atkins and Stabb are factually distinguishable from this case. In Atkins, 421 Md. at 440-41, 26 A.3d at 982, this Court held that the trial court abused its discretion in giving an anti-CSI effect jury instruction where, while cross-examining a detective, the defendant elicited that law enforcement had not tested a knife for trace evidence. Similarly, in Stabb, id. at 470-71, 31 A.3d at 932, this Court held that the trial court abused its discretion in giving an anti-CSI effect jury instruction where: (1) while cross-examining a detective and a social worker, the defendant elicited that law enforcement had not conducted a sexual assault forensic examination of the victim; and (2) during his closing argument, the defendant "commented on the lack of physical evidence[.]" In contrast to this case, in neither Atkins nor Stabb did the defendant ever misstate the State's burden, thus necessitating a curative instruction.

I am unpersuaded by any reliance on skepticism that the CSI effect exists as a basis for determining that the circuit court abused its discretion in this case. Theoretically, the CSI effect causes jurors to "unrealistic[ally] expect[]" scientific evidence, and thus misleads jurors to believe that the State is required to offer scientific evidence to satisfy the State's burden of proof beyond a reasonable doubt. Stabb, 423 Md. at 467 n.3, 31 A.3d at 930 n.3. Even if the CSI effect does not exist, a defendant can nonetheless mislead jurors by representing to them that the State is required to offer scientific evidence to satisfy its burden of proof beyond a reasonable doubt, and there would be no colorable argument against giving an anti-CSI effect instruction. As

explained above, here, Robinson's counsel did essentially that. Although Robinson's counsel did not explicitly tell the jury that the State is required to offer scientific evidence, Robinson's counsel insinuated as much by: (1) listing types of scientific evidence, piece by piece; and (2) in the next sentence, telling the jury there was "**absolutely no** evidence beyond a reasonable doubt[.]" (Emphasis added). Under these circumstances, the circuit court did not abuse its discretion in giving the anti-CSI effect jury instruction.

Judge McDonald has authorized me to state that he joins in this opinion.